## SPALDING *v.* CHANDLER.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 86. Argued December 2, 1895. — Decided January 6, 1896.

The Indian reservation at Sault Ste. Marie, under the treaty of June 26, 1820, with the Chippewas, continued until extinguished by the treaty of August 2, 1855; and upon the extinguishment of the Indian title at that time the land included in the reservation was made, by § 10 of the act of September 4, 1841, not subject to preëmption.

THE plaintiff in error claimed the land in dispute in this controversy under an alleged preëmption entry. The claim of the defendant in error rested upon a patent from the United States. The case is stated in the opinion of the court.

*Mr. John C. Donnelly* and *Mr. A. C. Raymond* for plaintiff in error.

*Mr. John H. Goff* for defendant in error.

MR. JUSTICE WHITE delivered the opinion of the court.

Plaintiff in error by a bill in equity filed in the Circuit Court of the county of Chippewa, State of Michigan, sought

to have a trust declared in his favor in certain lands at Sault Ste. Marie, Michigan, at one time a part of what was known as the "Indian Reserve," which land had been patented by the United States to the defendant, and to have the defendant ordered to execute a conveyance of the legal title.

The facts in the case, as developed upon the trial, were as follows: On June.26, 1820, 7 Stat. 206, the Chippeway tribe of Indians ceded to the United States sixteen square miles of land. The tract ceded commenced at the Sault and extended two miles up and the same distance down the river with a depth of four miles, including a portage, the site of the village of Sault Ste. Marie, and the old French fort. Schoolcraft's American Lakes, p. 140. One of the objects of the expedition which effected the signing of the treaty was to prepare the way for an American garrison at the Sault. Ib. p. 135. At the time of the signing of the treaty there were about forty lodges of Chippewa Indians, containing a population of about two hundred souls, resident at the Sault, who subsisted wholly upon the whitefish which were very abundant at the foot of the Falls near by the village. Ib. p. 133. The village settlement of the whites consisted of about fifteen or twenty buildings. Ib. p. 132. By the third article of the treaty it was provided that "the United States will secure to the Indians a perpetual right of fishing at the Falls of St. Mary's, and also a place of encampment upon the tract hereby ceded, convenient to the fishing ground, which place shall not interfere with the defences of any military work which may be erected, nor with any private rights." The military post of Fort Brady was established on a part of the tract within a few years following the execution of the treaty.

On March 24, 1836, 7 Stat. 491, the Ottawa and Chippewa Nations ceded to the United States a large tract of territory, including in its general limits the sixteen square miles above mentioned. By article third of this treaty the right of fishing and encampment was preserved to the Indians in the following words: "It is understood that the reservation for

a place of fishing and encampment, made under the treaty of St. Mary's, of the 16th of June, 1820, remains unaffected by this treaty." In 1845, under the directions of the surveyor general for the Northwest Territory a survey was made at Sault Ste. Marie, and upon the map of said survey was noted the territory occupied by the military, as shown by the stockade or high posts around such occupation, and also the ground then in the occupation of the Indians under the treaty of 1820, and each of said reservations was respectively noted upon the map as the "Military Reserve" and the "Indian Reserve." At the time of the making of the survey of 1845 there was no occupation of the Indian reserve other than by Indians, and a raceway bounded the reserve on the south.

By an act approved March 1, 1847, c. 32, 9 Stat. 146, Congress established the Lake Superior land district in Michigan, embracing therein, among other land, the territory ceded by the Chippewas under the treaty of 1820, and provision was made for a geological survey and examination of the lands therein. It was provided in the closing sentence of section 2 that all non-mineral lands within said district should "be sold in the same manner as other lands under the laws now in force for the sale of the public lands; excepting and reserving from such sales section sixteen in each township for the use of schools, and such reservations as the President shall deem necessary for public uses."

On April 3, 1847, pursuant to the recommendation of the Secretary of the Treasury, based upon a communication from the Commissioner of the General Land Office, acting on the suggestion of the Fifth Auditor of the Treasury, the President ordered that certain described lands in the northern peninsula of Michigan, or so much thereof as might be found necessary, should be reserved for public uses, and in said described land was included the north fractional half of fractional township 47 north, of range 1 east, which embraced the Indian reserve in question as also the site of Fort Brady.

On August 25, 1847, as the result of a report of Brigadier General Brady, commanding the Fourth Military Department, the acting Secretary of War made application to the Commis-

sioner of the General Land Office "to cause to be reserved from sale the sections colored in red on the enclosed plat, embracing sections 4, 5, and 6 of township 47, range 1 east, and an additional tract adjoining the last-named section on the west not designated by number on the plat." On August 27, 1847, the Commissioner wrote to the Secretary of the Treasury, calling his attention to the fact that sections 4, 5, and 6 of township 47 north, range 1 east, had been reserved for public uses by the President on April 3, 1847, and requested that the Secretary make application "to the President for an order for the reservation of fractional sections 1 and 2, township 47 north, range 1 west, under the same act, for the use of Fort Brady." On August 30, 1847, this communication was transmitted to the President by the Secretary of the Treasury, together with a diagram exhibiting the location of the lands, and the President was asked to give his sanction to the proposed reservation. The request was complied with. Sections 1 and 2, township 47 north, range 1 west, lay to the westward of the Indian reserve, and the military post as then occupied was east of the Indian encampment.

The report of General Brady above referred to accompanied a plat prepared under his direction by Lieutenant Westcott, commandant at Fort Brady, of land which had been surveyed for military purposes. General Brady stated in his report —

"In making this reserve, I kept in view the probability that some day the government might build there a permanent work.

"As you have in your letter of instructions to me on this subject desired me to give my views in relation to that post, I shall merely observe that I believe that the best interests of the government and that of the community at large would be benefited by the government not offering for sale any of the lots fronting on the line of the canal from the reserve to the head of the rapids, believing, as I most assuredly do, that the day is not far distant when a canal will be made there, if not by the general government, by Michigan and the adjoining States. The quantity of the land that it will require to receive the rocks and other materials that will be taken out of

a ship canal there no one can know, and until the canal is made those lots had better remain with the present owner. Should they go into the hands of individuals before the canal is completed, great would be the expense to get back the land necessary for the completion of this important work."

The village of Sault Ste. Marie was incorporated by the legislature of Michigan April 2, 1849, (Laws of Michigan, 1849, No. 255, pp. 336, 337,) and included within its boundaries the military reserve of Fort Brady and the Indian reserve.

This act of incorporation was repealed in 1851, but while in force, to wit, on September 26, 1850, c. 71, an act was approved, 9 Stat. 469, which provided for the examination and settlement of claims for land at the Sault Ste. Marie in Michigan. By section 2 of the act, the Commissioner of the General Land Office was authorized to cause the register and receiver of the land office at Sault Ste. Marie to be furnished with a map, on a large scale, of the lines of the public surveys at the Sault Ste. Marie. And it was further provided in said section that : "It shall be the duty of the Secretary of War to direct the proper military officer, on the application of the register and receiver, to designate or cause to be designated upon the map aforesaid the position and the extent of lots necessary for military purposes, as also the position and the extent of any other lot or lots which may be required for other public purposes, and also the position and the extent of the Indian agency tract and of the Indian reserve." Specific directions with regard to the survey and map in question were also given in the seventh section of the act.

On February 15, 1853, the Commissioner of the General Land Office acknowledged receipt of a communication from the register and receiver at Sault Ste. Marie, of date 24th of September, 1852, wherein it had been suggested that a modification be made of the western boundary of the military reservation, so as to obviate a conflict with town and town lot claims, and the Commissioner advised the register and receiver that the Secretary of War had approved of the Westcott survey as the true limits of the military reservation. In their report of April 4, 1853, on the settlement of land claims at Sault Ste.

Marie, the register and receiver, under the head of "Reservations," say : "In accordance with the second section of said act, (September 26, 1850,) and the instructions, the military reservation of Fort Brady, according to 'Westcott's survey,' so called, the Indian reserve, the Indian agency reserve and the Ste. Marie's canal reservation, of four hundred feet in width, as located by Capt. Canfield on the 14th of October, 1852, acting under authority from the governor of Michigan, have been designated on the plat of the public survey of said village accompanying our abstracts, and our adjudications have been confined strictly to claims outside of said reservation, and in no instance have we confirmed claims, or any portion of the same, within said reservations."

The survey under the act of 1850 is known as the Whelpley survey. As the map of survey indicates, the limits of the military reserve shown by the survey embraced simply the land required for the then use and occupation of the fort, and not the land reserved in 1847 by the orders of the President. The military reserve noted on the Whelpley map lay outside of and to the east of the Indian reserve. Pending the settlement of the claims of settlers on the lands at Sault Ste. Marie, under this act of 1850, an act of Congress was approved August 26, 1852, c. 92, 10 Stat. 35, granting to the State of Michigan the right of way and a donation of public lands for the construction of a ship canal round the Falls of St. Mary. The work of constructing this canal was begun in 1852, and it was completed in the year 1855, and, as authorized and constructed, extended entirely across the Indian reserve as delineated on the 1845 and Whelpley maps of surveys, cutting the reservation into three parts, two of which lay north of the canal and one south of the canal.

August 2, 1855, the Chippewa Indians released to the United States, 11 Stat. 631, the privileges retained by them under the treaty of 1820. The language employed was : "The said Chippewa Indians surrender to the United States the right of fishing at the Falls of St. Mary's, and of encampment convenient to the fishing grounds, secured to them by the treaty of June 16, 1820."

On September 10, 1859, one Byron D. Adsitt built a small house on one of the tracts north of the canal, went into possession of the same, fenced a portion of the land, and planted a small garden. A month thereafter he paid $45.63 to the register of the land office at Marquette, Michigan, and entered for preëmption " the lot designated on the maps of the United States survey in the land office at Marquette, Michigan, as Indian reserve, (subject to all the provisions, requirements, and conditions of the act of Congress, entitled ' An act granting to the State of Michigan the right of way and a donation of public land for the construction of a ship canal around the Falls of Ste. Mary's in said State,') in section six (6), township 47 north of range 1 east." The described land was said to contain 36.50 acres of land, be the same more or less. The papers in the case were forwarded to the Commissioner of the General Land Office at Washington, who replied on April 9, 1860, that the claim was cancelled, because the land claimed was not subject to preëmption, and the register was directed to note the cancellation on his books and plats, and to notify Adsitt to make application for a refunding of his payment. The Commissioner called the attention of the register to a previous letter of June 9, 1853, by which two claims were cancelled, because within the " reservation for Fort Brady," as made by the President's order of September 2, 1847, heretofore referred to.

The evidence introduced at the trial was to the effect that this tract called the Indian reserve was occupied by the Indians to the knowledge of witnesses from 1845 to 1885, the Indians living at first in wigwams and latterly in log houses, and about the time of Adsitt's attempted preëmption the Indians had at least a half dozen houses on the reserve north of the . canal, those located there being employed at fishing in the rapids, or in carrying people over the rapids, and selling their catch of fish to the post, villagers and those passing through the canal in boats. They were not known to raise any crops from the land. The ground was rocky and not suitable for agricultural purposes.

On August 7, 1860, Adsitt, for the expressed consideration.

of one dollar, conveyed, by quitclaim deed, all his right and title in the lands in question to plaintiff in error. Spalding, however, testified that the actual consideration paid by him was not less than one hundred dollars. He did not occupy the property.

On May 17, 1881, the defendant located what was known as Porterfield scrip on the particular tract in the reserve, upon which Adsitt had erected the house. Upon learning of the application for a patent, complainant recorded the deed from Adsitt, and mailed a written protest against the issuance of a patent to the land department at Washington. The Commissioner of the General Land Office replied to Spalding, by letter of date January 18, 1882, informing him that Adsitt's entry had been cancelled April 9, 1860, and directed him to apply for a refunding of the purchase money, enclosing blanks therefor. On December 15, 1883, a patent for the land (9.10¾ acres) was issued to defendant in error. Between the fall of 1887 and the spring of 1888 a canal was dug to furnish power, and an electric light plant was constructed upon the tract. The aggregate cost of the plant, with the machinery therein, was in the neighborhood of fifty thousand dollars. Spalding knew of the improvements as they progressed, but took no steps to assert his alleged rights until the filing of the bill in this action, November, 1888. The testimony for the defence tended to show that the land was of no value except for the purpose of water power.

Upon the hearing of the cause in the Chippewa Circuit Court, a decree was entered for the defendant, and, on appeal, the judgment was affirmed by the Supreme Court of the State. The cause was then brought into this court by writ of error.

While we are strongly inclined to the opinion that the circumstances of this case are not such as should call into active exercise the powers of a court of equity on behalf of the complainant, even though his grantor upon his attempted entry of the Indian reserve was entitled to a patent upon the certificate issued to him by the receiver of the land office at Marquette, we have concluded to dispose of the case on the ground

upon which the Supreme Court of the State based their affirmance of the judgment of the trial court, to wit, that the land sought to be preëmpted was land which had been an ,Indian reservation, the Indian title to which had been extinguished while the preëmption act of September 4, 1841, c. 16, 5 Stat. 453, was in force. By the tenth· section of that act it was provided that no "Indian reservation to which the title has been or may be extinguished by the United States at any time during the operation of this act . . . shall be liable to entry under and by virtue of the provisions of this act."

The reasons for the exemption from preëmption of land which had been used as an Indian reservation are clearly set forth in the opinion of the court, speaking through Mr. Justice Miller, announced in *Roots* v. *Shields*, 1 Woolworth, 340. He said (p. 362): "Whenever a town springs up upon the public lands, adjoining lands appreciate in value. .The reasons are obvious, and the fact is well known. So, too, when a railroad is built through a section of country, the same result follows. So, too, in respect of lands which have been reserved for the use of an Indian tribe, when the Indian title is extinguished, the same may be said. While such lands are held as reserve, population flows up to their boundaries and is there staid; it of course constantly grows more and more dense, so that when the reserve is vacated the lands have increased in value, and are always eagerly sought after. The other classes of lands mentioned in the exception, as, for instance, those on which are situated any known salines or mines, have some intrinsic value above others. Now all these classes of lands are excepted from the operation of the act, and for one common and obvious reason, that being of special value, the government desires to retain the advantage of their appreciation, and is unwilling that any individual, because of a priority of settlement, which certainly can be of but brief duration, should, to the exclusion of others equally meritorious, reap benefits which he did.not sow."

It has been settled by repeated adjudications of this court that the fee of the lands in this country in the original occupation of the Indian tribes was from the time of the formation

of this government vested in the United States. The Indian title as against the United States was merely a title and right to the perpetual occupancy of the land with the privilege of using it in such mode as they saw fit until such right of occupation had been surrendered to the government. When Indian reservations were created, either by treaty or executive order, the Indians held the land by the same character of title, to wit, the right to possess and occupy the lands for the uses and purposes designated.

By the treaty of June 16, 1820, the Indians ceded to the United States a tract of land lying between the Big Rock and Little Rapid in the river St. Mary's, and running back from the river so as to include sixteen square miles of land, but by the third article of the treaty it was provided that the "United States will secure to the Indians a perpetual right of fishing at the Falls of St. Mary's, and also a place of encampment upon the tract hereby ceded, convenient to the fishing grounds, which place shall not interfere with the defences of any military work which may be erected, nor with any private rights." It is not necessary to determine how the reservation of the particular tract subsequently known as the "Indian Reserve" came to be made. It is clearly inferable from the evidence contained in the record that at the time of the making of the treaty of June 16, 1820, the Chippewa tribe of Indians were in the actual occupation and use of this Indian reserve as an encampment for the pursuit of fishing. This view is confirmed by the provisions of the second article of the treaty of August 2, 1855, 11 Stat. 631, by which treaty, in the first article thereof, "the Indians surrendered to the United States the right of fishing at the Falls of St. Mary's, and of encampment convenient to the fishing grounds, secured to them by the treaty of June 16, 1820." By said second article it was provided that: "The United States will appoint a commissioner who shall, within six months after the ratification of this treaty, personally visit and examine the said fishery and place of encampment, and determine the value of the interest of the Indians therein as the same originally existed."

But whether the Indians simply continued to encamp where

they had been accustomed to prior to the making of the treaty of 1820, whether a selection of the tract afterwards known as the Indian reserve was made by the Indians subsequent to the making of the treaty and acquiesced in by the United States government, or whether the selection was made by the government and acquiesced in by the Indians, is immaterial. The clear duty rested upon the government to see that a tract was reserved for the purposes designated in the treaty. *United States* v. *Carpenter*, 111 U. S. 347, 349. If a survey was necessary for that purpose, it was the duty of the government to cause such survey to be made (Ib.), and it appears from the evidence that in 1845, in a survey made by the authority of the government, the exterior boundaries of the Indian reservation were delineated upon the map of the survey then made, and such boundaries were subsequently adopted in the survey under the act of 1850. The fact, therefore, is undisputed that the thirty-nine-acre tract attempted to be preëmpted by Adsitt was accepted by both parties to the treaty of 1820 as a place of encampment, in conformity to the treaty of 1820, convenient to the fishing grounds, and a place which did not interfere with the defences of any military work then or thereafter contemplated to be erected, nor with any private rights. If the reservation was free from objection by the government, it was as effectual as though the particular tract to be used was specifically designated by boundaries in the treaty itself. The reservation thus created stood precisely in the same category as other Indian reservations, whether established for general or limited uses, and whether made by the direct authority of Congress in the ratification of a treaty or indirectly through the medium of a duly authorized executive officer.

It is fairly to be implied from the language employed in the third article of the treaty of 1820 that an encampment location retained, selected, or assigned, as the case might be, reserved for the use specified in the treaty of 1820, should not thereafter be appropriated by the government for other uses than the defences of any military work. Private rights could not, without the authority of Congress, be acquired in the

tract during the occupancy of the reservation under the treaty, for the lands in question lost their character as public lands in being set apart or occupied under the treaty, and became exempt from sale and preëmption. *Missouri, Kansas & Texas Railway* v. *Roberts*, 152 U. S. 114, 116, 118.

On the trial below there was no attempt to prove that Congress ever made provision for the erection of military works which rendered necessary an intrusion upon the fishing encampment. The land actually appropriated for the then use of Fort Brady was located considerably to the east of the Indian reserve, and private settlements were made upon the intervening lands. The general grant of authority conferred upon the President by the act of March 1, 1847, c. 32, 9 Stat. 146, to set apart such portion of lands within the land district then created as were necessary for public uses, cannot be considered as empowering him to interfere with reservations existing by force of a treaty. The land was appropriated in a sense which exempted it from a reservation made in such general terms, at least so long as the Indian right of user remained unextinguished.

In the absence of express authority to set apart for public uses lands already reserved and appropriated for a particular use, we cannot infer an intention in the grant of power contained in the act of 1847 to authorize interference with the Indian reservation, particularly when such appropriation, as the record shows, was not made for then existing public necessities, but, as the letter of General Brady set out in the statement of facts shows, was merely a provision contemplated for the possibilities of the future, both with reference to a canal and the enlargement of military works, neither of which projects had then been sanctioned by Congress. The purposes of the treaty could not be defeated by the action of executive officers of the government. *United States* v. *Carpenter, supra.* As a matter of fact, therefore, the Indian reserve continued to exist and to be used for the purposes for which it came into existence long after the President's orders of 1847. As stated, the reserve was not extinguished or the rights of the Indians to the use of the tract destroyed or curtailed by those orders,

and if the reservation for public uses and for the purposes of Fort Brady made by the President's orders was valid, the operation of those orders so far as the Indian reserve was concerned was clearly postponed until after the extinguishment of the reserve either by a voluntary cession to the government, a cessation or abandonment of the use or the arbitrary exercise by Congress of its power to appropriate the same. The existence of the reserve, however, was expressly recognized by Congress in the act of September 26, 1850, authorizing the ascertainment and settlement of claims to lands at Sault Ste. Marie. The map of the survey ordered to be made of the village was required to have noted upon it the boundaries not only of the military reserve, but of the Indian reserve. We conclude, therefore, that, until the treaty of August 2, 1855, this Indian reservation was not extinguished. It is true that the act of August 26, 1852, c. 92, 10 Stat. 35, which granted to the State of Michigan the right of locating a canal through the public lands, known as the military reservation at the Falls at St. Mary's River in said State, authorized by such description the location of the canal mainly across and through the Indian reserve. It seems probable that the bill in question was drafted after consultation and with the approval of the War Department, the officials of which department had in 1847 sought the reservation by the President of lands at Sault Ste. Marie, in the belief that a canal was not a far distant possibility, and the designation of the land in question as the military reservation may properly be ascribed to that source. There is nowhere contained in the act, however, an allusion to the treaty of 1820, or an express declaration of an intention to interfere with the Indian reserve or the rights of the Indians in any portion of the reserve. And the express recognition by Congress of the existence of the reserve contained in the act of 1850, under which proceedings were being had at the time of the passage of the act of 1852 for a survey of the village and a map of the same, with the notation thereon of the various reservations, forbids the assumption that Congress no longer regarded the Indian reserve as in existence. Whatever the reason, however, for

the omission to make mention of the Indian reserve, the power existed in Congress to invade the sanctity of the reservation and disregard the guarantee contained in the treaty of 1820, even against the consent of the Indians, party to that treaty, and as the requirement of the grant necessarily demanded the possession of the portion of the reserve through which the canal was to pass, the effect of that act was to extinguish so much of the Indian reserve as was embraced in the grant to the State for canal purposes. *Missouri, Kansas & Texas Railway* v. *Roberts, supra*, 116–117.

As to the remaining portions of the reserve, however, the use and the right of use by the Indians continued, and, until they surrendered that right by the treaty of 1855, the reserve continued to exist. If the reservations made by the orders of 1847 were not then operative, it is clear that upon the extinguishment of the Indian title to possess and occupy the reserve the land stood simply in the category of lands included within an Indian reservation, the title to which had been extinguished by the United States during the operation of the act of September 4, 1841, c. 16, and, consequently, by the tenth section of that act, 5 Stat. 456, the land was not subject to preëmption. It follows that the attempted preëmption by Adsitt in 1859 was illegal, the Commissioner of the General Land Office properly ordered the cancellation of the entry certificate, the plaintiff in error acquired no right to the land in question by the quitclaim deed of Adsitt, and hence his bill was properly dismissed. The judgment of the Supreme Court of the State of Michigan is, therefore,

*Affirmed.*