## STEPHENS, APPELLANT, v. NACEY, RESPONDENT.

(No. 3,438.)

(Submitted May 6, 1914. Decided May 26, 1914.)

[141 Pac. 649.]

*Election Contests—Precincts on Indian Reservations—Residence*
*—Illegal Votes—Duty of Contestant—Burden of Proof—*
*Documentary Evidence—Certified Copies—Harmless Error.*

Election Contests—Indian Reservations—Residence.

1. *Held,* that that portion of the Ft. Peck Indian reservation which was set aside by Act of Congress as the town site of Poplar, and which was to be disposed of under section 2381, United States Revised Statutes, relating to town sites, and part of which had been patented to occupants and purchasers of lots, is not a part of an Indian reservation, within the meaning of section 499, Revised Codes, forbidding the establishment of election precincts upon Indian reservations, and Chapter 113, Laws of 1911, fixing the residence of those living upon such reservations.

Same—Illegal Votes—Duty of Contestant.

2. Under section 7234, subdivision 4, and section 7239, Revised Codes, one who contests an election on the ground of malconduct on the part of the election judges in receiving the votes of persons residing on an Indian reservation must furnish the contestee, at least three days before the trial, a list of the voters deemed to have illegally voted; his failure to do so defeats him.

Same—Burden of Proof.

3. In an election contest in which the contestant relies upon the ground of the reception of illegal votes, the burden is upon him to show that a sufficient number of illegal votes were cast to change the result.

[As to competency of circumstantial evidence to prove for whom illegal votes were cast at election, see note in Ann. Cas. 1912C, 522.]

Documentary Evidence—Certified Copies—Harmless Error.

4. The admission in evidence of a certified copy of a copy of the original plat of a town site on an Indian reservation, on file in the office of a county clerk, though erroneous (Rev. Codes, sec. 7924), *held* nonprejudicial where it was apparent that a properly certified copy could easily be procured and that no harm resulted from the use of the objectionable copy.

*Appeal from District Court, Valley County; J. Miller Smith,*
*a Judge of the First Judicial District, presiding.*

ELECTION CONTEST by James R. Stephens against Patrick Nacey. Judgment for the contestee, and contestant appeals. Affirmed.

*Messrs. Norris, Hurd & McKellar,* for Appellant, submitted a brief. *Mr. Edwin L. Norris* argued the cause orally.

The right to vote is neither a property right nor a right of persons, but a mere political privilege, which the legislature may regulate to any extent not prohibited by the state or federal constitutions. (*State* v. *Superior Court,* 60 Wash. 370, 140 Am. St. Rep. 925, 111 Pac. 233; 15 Cyc. 281; 10 Am. & Eng. Ency. of Law, 2d ed., 568; Cooley's Constitutional Limitations, 6th ed., 752; *Riter* v. *Douglas,* 32 Nev. 400, 109 Pac. 444; *Russell* v. *State,* 171 Ind. 623, 87 N. E. 13; *Savage* v. *Umphries* (Tex. Civ.), 118 S. W. 893; *Morris* v. *Colorado etc. Ry. Co.,* 48 Colo. 147, 139 Am. St. Rep. 268, 20 Ann. Cas. 1006, 31 L. R. A. (n. s.) 1106, 109 Pac. 430; *Healey* v. *Wipf,* 22 S. D. 343, 117 N. W. 521; *Coggeshall* v. *Des Moines,* 138 Iowa, 730, 128 Am. St. Rep. 221, 117 N. W. 309; *State* v. *Goldthait,* 172 Ind. 210, 87 N. E. 133; *Dewalt* v. *Bartley,* 146 Pa. 529, 28 Am. St. Rep. 814, 15 L. R. A. 771, 24 Atl. 185.) It is upon this principle that registration laws, laws requiring a voter to vote in the precinct of his residence, laws requiring an educational or property test, laws arbitrarily fixing the times for opening and closing the polls, laws providing for the method of voting, the nomination of candidates, the form of ballot to be used, *etc.,* are made to rest. (*State* v. *Superior Court, supra.*) As to the extent to which a legislature may go in enacting legislation to protect the purity of elections, see *Sclon* v. *State,* 54 Tex. Cr. 261, 114 S. W. 349.

Requirements of law relative to the place of holding elections are mandatory, and an election held at a place not authorized by law is void. (McCrary on Elections, 4th ed., sec. 176; 15 Cyc. 343; 10 Am. & Eng. Ency. of Law, 2d ed., 686, 687; *Goree* v. *Cahill,* 35 Okl. 42, 128 Pac. 125; *Johnstone* v. *Robertson,* 8 Ariz. 361, 76 Pac. 465; *Walker* v. *Sanford,* 78 Ga. 165, 1 S. E. 424; *Melvin's Case,* 68 Pa. 333; *Williams* v. *Potter,* 114 Ill. 628, 3 N. E. 729; *Dickeys* v. *Hurlburt,* 5 Cal. 343.)

The Constitution does not define the term "residence" or prescribe how it may be gained or lost, or what constitutes a

residence for voting purposes. The legislature, therefore, has full power so to do. (Cooley's Constitutional Limitations, 200; *Missouri River Power Co.* v. *Steele,* 32 Mont. 433, 80 Pac. 1093; *In re Boyce,* 27 Nev. 299, 1 Ann. Cas. 66, 65 L. R. A. 47, 75 Pac. 1.) Section 2 of Article IX of the Constitution in effect provides that the legislature may prescribe the period of residence for voting purposes in a county or precinct. The term "residence" used in the Constitution and statutes of this state has various meanings. (Const., Art. IX, sec. 2; Art. VII, sec. 1; Art. IX, sec. 3; Rev. Codes, sec. 32.) The term "residence" means more than physical presence in a community. (See *Hale* v. *Stimpson,* 198 Mo. 134, 95 S. W. 885; *Silvey* v. *Lindsay,* 107 N. Y. 55, 13 N. E. 444; *Wolcott* v. *Holcomb,* 97 Mich. 361, 23 L. R. A. 215, 56 N. W. 837; *Powell* v. *Spackman,* 7 Idaho, 692, 54 L. R. A. 378, 65 Pac. 503.) In the case of *People* v. *Dibble,* 16 N. Y. 203, a statute of that state prohibiting persons from going upon an Indian reservation and providing for their summary removal therefrom was upheld. This decision was afterward upheld by the supreme court of United States in *New York* v. *Dibble,* 21 How. (U. S.) 366, 16 L. Ed. 149. If a state may prohibit a person from going upon an Indian reservation, the law may prohibit such persons from acquiring voting residences thereupon.

It will be urged by the respondent that certain persons who voted at Poplar precinct and who resided within the town site of Poplar were not residing on an Indian reservation and were therefore qualified electors, and that the polling place which was situated upon Great Northern right of way was not on an Indian reservation. This position of respondent necessarily assumed that persons residing outside of Poplar town site were not qualified electors. From this position of the respondent it is clear that approximately two-thirds of the votes cast at Poplar precinct were tainted with illegality. Before the respondent could claim any votes cast in that precinct, it was necessary for him to purge the poll. (*Lloyd* v. *Sullivan,* 9 Mont. 577, 24 Pac. 218; *Russell* v. *McDowell,* 83 Cal. 70, 23 Pac. 183; *Ryan* v. *Town of Waurika,* 29 Okl. 655, 119 Pac. 220.)

That the legislature intended to include within the term "on an Indian reservation" all persons living within the exterior boundaries of such reservation appears to be too obvious to require argument. The purpose of this legislation would be defeated were it interpreted to have reference to the character of the title to the land within such reservation. The control of the Fort Peck Indian reservation by the government is as complete as it was before the survey of the town site of Poplar and the filing of the plat thereof. In the case of *Deroya* v. *Hill Investment Co.,* 33 Okl. 663, 127 Pac. 444, the supreme court of Oklahoma, in determining the meaning of the term "residing on an Indian reservation" held that it connotes all persons who live within the exterior boundaries of such reservation without regard to the character of the title of the land. To the same effect are *United States* v. *Certain Property,* 1 Ariz. 31, 25 Pac. 517; *State* v. *Hitchcock,* 185 U. S. 373, 46 L. Ed. 954, 22 Sup. Ct. Rep. 650.

The Indian right of occupancy to the Fort Peck Indian reservation, or to any part thereof, so far as the record discloses, has not been extinguished. The land included therein, therefore, retains the character of Indian reservation and Indian country attached to it by the statute creating such reservation, and until the Indian right of occupancy shall have been extinguished, it will retain such character. (*Buttz* v. *Northern Pac. Ry. Co.,* 119 U. S. 55, 30 L. Ed. 330, 7 Sup. Ct. Rep. 100; *Beecher* v. *Wetherby,* 95 U. S. 517, 24 L. Ed. 440; *Clark* v. *Smith,* 13 Pet. (U. S.) 195, 10 L. Ed. 123; *Byrne* v. *Alas,* 74 Cal. 628, 636, 16 Pac. 523; *State* v. *Kennard,* 57 Neb. 711, 78 N. W. 284; *Kreuger* v. *Schultz,* 6 N. D. 310, 70 N. W. 269; *Atlantic & P. R. Co.* v. *Mingus,* 165 U. S. 413, 41 L. Ed. 770, 17 Sup. Ct. Rep. 348; *Atlantic & P. R. Co.* v. *Laird,* 164 U. S. 393, 41 L. Ed. 485, 17 Sup. Ct. Rep. 120; *Jones* v. *Meehan,* 175 U. S. 1, 44 L. Ed. 49, 20 Sup. Ct. Rep. 1; *Clairmont* v. *United States,* 225 U. S. 551, 56 L. Ed. 1201, 32 Sup. Ct. Rep. 787.)

*Mr. John L. Slattery* and *Messrs. Purcell & Horsky* submitted a brief; *Mr. R. R. Purcell* and *Mr. Antone J. Horsky* argued the cause orally.

The Fort Peck Indian reservation is a part of Valley county. The jurisdiction of the state extends over the Indian reservation; and all white men residing on the reservation and Indians who have dissolved their tribal relations are amenable to the laws of the state, and their property is taxable the same as any other resident of the state of Montana. (*Cosier* v. *McMillan,* 22 Mont. 484, 56 Pac. 965; *Stiff* v. *McLaughlin,* 19 Mont. 300, 48 Pac. 232; *State* v. *Campbell,* 53 Minn. 354, 21 L. R. A. 169, 55 N. W. 553; *Torrey* v. *Baldwin,* 3 Wyo. 430, 26 Pac. 908; *Moore* v. *Beason,* 7 Wyo. 292, 51 Pac. 875.) Qualified electors residing upon this reservation have the same right to vote as the qualified electors who do not reside upon the reservation, but to deprive them of an election precinct or of a polling place, or to require that the polling place shall be established a great distance from their habitation, in effect deprives them of the right of suffrage. The right of a citizen to vote, granted him by the Constitution cannot be impaired or taken away, even by an Act of the legislature. (*Morris* v. *Powell,* 125 Ind. 281, 9 L. R. A. 326, 25 N. E. 221; *Spier* v. *Baker,* 120 Cal. 370, 41 L. R. A. 196, 52 Pac. 659; *Attorney General* v. *Common Council of Detroit,* 78 Mich. 545, 18 Am. St. Rep. 458, 7 L. R. A. 99, 44 N. W. 388; *Earl* v. *Lewis,* 28 Utah, 116, 77 Pac. 235; 10 Am. & Eng. Ency. of Law, 2d ed., 573.) The cases of *State* v. *Denoyer,* 6 N. D. 586, 72 N. W. 1014, *State ex rel. Crawford* v. *Norris,* 37 Neb. 299, 55 N. W. 1086, and *Hankey* v. *Bowman,* 82 Minn. 328, 84 N. W. 1002, establish conclusively the contention we are making, namely, that citizens of the United States living upon an Indian reservation and possessing the constitutional qualifications have the same right to vote as citizens residing in any other part of the state; and that if qualified electors reside upon an Indian reservation, it is the duty of election officials to establish voting precincts for them. Even the Indians living upon their reservations, after complying with certain requirements as pointed out in these cases, are entitled to vote; and yet this court is asked to deny to the white citizens, qualified electors residing within the boundaries of an Indian reservation,

the same right.   They also lend force to the argument that the sections of our statute, relied upon by appellant, are unconstitutional and void; and, in fact, we believe they are conclusive on that point.

The jurisdiction of the Interior Department over the allotment of Indian lands, as well as the segregation of town sites, and the laying out and platting of the same and determining to whom the lots should be scheduled, is exclusive (*Brennan* v. *Shanks*, 24 Okl. 563, 103 Pac. 709), and the appellant cannot, in a collateral proceeding, seek to show that there is some outstanding title held by the Indians.   It is not disputed that the United States government owns the fee in the lands embraced within the boundaries of this reservation, and that it is the source of title to this land.   (*Spalding* v. *Chandler*, 160 U. S. 394, 40 L. Ed. 469, 16 Sup. Ct. Rep. 360.)   The court, in the above case, says that the only title held by the Indians is merely a title and right to the occupancy of the land for the uses and purposes designated.   Whenever a grant is made by the government of lands within an Indian reservation, and the grant necessarily demands the possession of the lands granted, the Indian title of occupancy is extinguished and the land so granted is no longer a part of the reservation.   (See, also, *Missouri, K. & T. R. Co.* v. *Roberts*, 152 U. S. 114, 38 L. Ed. 377, 14 Sup. Ct. Rep. 496; *United States* v. *Alaska Packers' Assn.*, 79 Fed. 152.)

Applying the rules of law laid down in these cases to the facts in the case at bar, only one conclusion can be reached, and that is: that the land within the boundaries of this town site, as well as the right of way of the Great Northern Railway, had been segregated from the reservation proper, and the Indian title or right of occupancy in both had been extinguished for more than a year prior to the last general election, because the issuance of patents to the residents of Poplar town site and the grant of the right of way to the Great Northern Railway necessarily presupposed possession by the grantees, which of itself, under the authorities just considered, operated to extinguish

the Indian title or right of possession. The railway company had to take possession of its right of way to transact its business; the grantees named in the patents had to take possession of their lots in order to improve them. It was necessarily presupposed, when the patents were issued, that the grantees therein named would get a title in fee simple and the right to the absolute possession of the lots described in those patents without any outstanding title of any kind or character in the Indians or anybody else, whereby the right to possess and occupy them might in any way be questioned or interfered with. "A patent, regularly signed, sealed, countersigned and duly recorded, passes to the grantee a perfect right to the possession of, and title to that part of the public domain for which it calls." (*United States* v. *Schurz,* 102 U. S. 378, 26 L. Ed. 167; *Moore* v. *Robbins,* 96 U. S. 530, 24 L. Ed. 848; *Johnson* v. *Drew,* 171 U. S. 93, 43 L. Ed. 88, 18 Sup. Ct. Rep. 800; *Shepley* v. *Cowan,* 91 U. S. 330, 23 L. Ed. 424.) "A patent justifies a presumption that all previous requisites of the law have been complied with." (10 Ency. of U. S. Sup. Ct. Rep. 37; *Polk* v. *Wendal,* 9 Cranch, 87, 3 L. Ed. 665.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Election contest involving title to the office of sheriff of Valley county. Heretofore a judgment by the district court dismissing the contest for want of jurisdiction was reversed, and it was directed that the right to the office be determined as it should be made to appear under the issues of fact presented by the pleadings. (*Stephens* v. *Nacey,* 47 Mont. 479, 133 Pac. 361.) The allegations in the original statement impeached the legality of the vote cast at polling place No. 1, of Saco precinct, and the entire vote cast at Poplar precinct. Prior to the trial the contestant, by leave of court, amended the statement so as to eliminate the allegations impeaching the vote cast at Saco, thus leaving for determination only the question whether the vote as cast at Poplar precinct was properly re-

turned by the judges and clerks of election at that precinct and included by the board of canvassers in ascertaining the result. According to the result as declared by the board, the contestant received a total of 1,084 and the contestee 1,110 votes, thus showing the election of the contestee by a plurality of 26 votes. At Poplar precinct there were cast for the contestant and contestee a total of 56 votes, of which the former received 11 and the latter 45. If, therefore, the vote at this precinct should be rejected, it would leave the totals 1,073 for the contestant, and 1,065 for the contestee, thus establishing the election of the former by a plurality of 8 votes. It is alleged that all the votes cast at Poplar precinct were illegal, and should have been rejected by the board of canvassers, for the reasons: That the town of Poplar is situated on the Ft. Peck Indian reservation; that the boundaries of Poplar precinct are wholly within the boundaries of the reservation; that it was not lawful to establish a precinct there; that all the persons who cast their votes there resided upon the reservation, and therefore, not being residents of the state of Montana, were not qualified electors; and that, in receiving and counting their votes and including them in the sum total of the votes cast, the judges of election and the board of county canvassers were guilty of malconduct in the performance of their duties. The issues joined upon these allegations the court found generally in favor of the contestee and, directed judgment to be entered accordingly. Contestant has appealed.

Section 499 of the Revised Codes declares: "No officer of this state, nor of any county, must establish a precinct within the limits of any county not fully organized, or at any Indian agency, or at any trading post in the Indian country or on any Indian reservation."

In section 21, Chapter 113 of the Laws of 1911 (Laws 1911, p. 223), are found these provisions:

"1. That place must be considered and held to be the residence of a person in which his habitation is fixed and to which, whenever he is absent, he has the intention of returning.

"2. A person must not be held to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, * * * nor while a student at any institution of learning, nor while kept at any almshouse or other asylum at the public expense, nor while confined in any public prison, nor while residing upon any Indian or military reservation."

"11. Any person living upon an Indian or military reservation shall not be deemed to be a resident of Montana, within the meaning of this chapter, unless such person has acquired a residence in some county in Montana prior to taking up his residence upon such Indian or military reservation; provided, that if such person shall not be in the employ of the government while residing upon such Indian or military reservation, such person shall not be considered a resident of the state of Montana."

These provisions, so far as they apply to this case, may be summarized as follows: (1) That the residence of an elector for voting purposes is at the place of his fixed habitation to which, when absent therefrom, he expects to return; (2) that a voting precinct cannot lawfully be established upon an Indian reservation; (3) that after a person has gained a residence in any county of the state, he does not lose his residence or acquire another by living upon an Indian reservation—in other words, his residence for voting purposes remains at the place where he acquired it before going upon the reservation; and (4) that a person who has not theretofore acquired a residence in some county at a place off the reservation shall not be deemed a resident of Montana by virtue of his residence upon the reservation, unless he shall be in the employ of the government while upon the reservation.

Counsel have discussed extensively in their briefs the validity of the foregoing provisions; counsel for the contestee urging that they are repugnant to several provisions of the Constitution, in that they arbitrarily deprive qualified electors of their right to vote as guaranteed by that instrument. As we view the case, it is not necessary to determine any of the questions

presented and discussed in this behalf. Upon the facts ad-
[1] mitted or proven at the trial (there was no substantial
conflict in the evidence), the trial court concluded that it was
lawful for the county commissioners to establish a voting pre-
cinct at Poplar, because it is not upon an Indian reservation,
within the meaning of section 499, *supra;* that the persons who
cast their votes there were qualified electors; and that the
return of the vote, as made by the clerks and judges, was prop-
erly canvassed, and included in the estimate of the board of
county commissioners ascertaining the final result.

These facts are not disputed: By an Act of the Congress
approved February 15, 1887 (24 Stat. 402, Chap. 130), there
was granted to the St. Paul, Minneapolis and Manitoba Rail-
way Company a right of way 150 feet in width across the lands
included in the Ft. Peck Indian reservation, from east to west.
The grant also included other lands adjacent to the line of
road at station points, to the extent of 300 feet in width and
3,000 feet in length, for station buildings, shops, *etc.* Subse-
quently the Great Northern Railway Company succeeded to
the rights of the original grantee, and has since occupied the
right of way ·with its railroad. By section 3 of the Act of
Congress, providing for the survey and allotment of the lands
embraced within the limits of the reservation and for the sale
of the surplus lands after allotment, approved May 30, 1908
(35 Stat. 558, Chap. 237), the original grant was supplemented
by a grant of other lands along the right of way for reservoirs,
dam sites, *etc.,* for use in connection with the operation of the
railroad. By section 14 of the latter Act the Secretary of
the Interior was authorized to reserve and set aside for a town
site ·at Poplar, a settlement which had grown up near the
agency located there, and about midway between the east and
west boundaries of the reservation, a tract of land of not less
than forty acres. He was directed to have this surveyed, laid
out and platted into lots, streets, alleys and parks, and there-
upon to dispose of the lots by sale, as provided by section 2381
of the United States Revised Statutes (U. S. Comp. Stats.
1901, p. 1455; 3 Fed. Stats. Ann., p. 583), relating to town

sites on public lands. There was reserved, however, to persons actually occupying lots at the time of the survey the right to make entries thereof for patents prior to the time fixed for public sale. Under the authority thus conferred, a town site of 130.82 acres was reserved, and the plat of it was filed in the General Land Office at Washington prior to October 30, 1909, and subsequently a copy was filed in the local land office at Glasgow. The town site is on the line of the railroad, and its south boundary is the north line of the railroad right of way. Prior to the date of the election in November, 1912, which gave rise to this contest, many patents had been issued to occupants and purchasers of lots, and at that time the population residing in the settlement and engaged in trade and other occupations amounted to about 600. Since the date of the creation of the town site the federal government has treated it as not a part of the reservation, for purposes of trade with the Indians, in that it has ceased to require persons engaged in trade there to obtain a license. Moreover, from the time patents have issued, the lots have been assessed and taxed for state and county purposes, the same as real estate owned by residents in Valley county outside of the reservation, and the same as the right of way and other lands held by the Great Northern Railway Company. The Indian agency is on land outside of the town site.

It is conceded by counsel for contestant that at the date at which the grant to the railway company became effective the Indian title to the lands granted was extinguished, and that they at once became segregated from the reservation and subject to the jurisdiction of the state government. It is insisted, however, that, since Poplar is within the boundaries of the reservation, and it does not appear that the Indian title to the land reserved for the town site has been extinguished, it still retains the character of Indian country, and hence the establishment of a precinct and the reception of votes there was in contravention of the provisions of section 499 of the statute *supra.*

We think the concession of counsel that the grants of the right of way and other lands for railroad purposes operated to extinguish the Indian title to the lands granted carries with it necessarily the concession that the establishment of the town site extinguished the Indian title to the lands included within it also; for, so far as we have been able to ascertain, the grants for railroad purposes were made without consent of the Indians by treaty or otherwise, and by force of the Act of Congress making them, without reservation of any right in favor of the Indians. The reservation of a town site for the purpose of sale of lots to occupants or anyone else who might purchase them was made in the same way; and it must be that, if, by virtue of the Acts making the grants to the railway companies, the federal government renounced jurisdiction over the subject of them, for the same reason, by setting aside the town site and granting patents to the lots therein to private citizens, it renounced jurisdiction over it for all other purposes than to dispose of the lots, and it thereby became subject to the jurisdiction of the state for general governmental purposes.

It is true that when Montana was admitted into the Union the federal government retained, and the people of Montana conceded to it, absolute control of, and jurisdiction over, all lands lying within the state "owned or held by any Indian or Indian tribes," until the title thereto should be extinguished by the federal government. (Act Feb. 22, 1908, Chap. 180; 25 Stat. 676, sec. 4; Mont. Const., Ordinance 1.) It is also true that, when lands are reserved for the use of Indians, the fee is under the control of the federal government, and that the manner, time, and conditions on which their title shall be extinguished are matters to be determined exclusively by the government. (*Missouri, K. & T. Ry. Co.* v. *Roberts,* 152 U. S. 114, 38 L. Ed. 377, 14 Sup. Ct. Rep. 496; *Spalding* v. *Chandler,* 160 U. S. 394, 40 L. Ed. 469, 16 Sup. Ct. Rep. 360.) It is none the less true that when a grant is made of any part of such lands to a railway company for its right of way, and the grant is absolute in its terms, giving to the grantee

49 Mont.—16

the right of possession and occupancy for the purposes of the grant, such grant must of necessity extinguish entirely the Indian title. It was so held by the supreme court of the United States in *Spalding* v. *Chandler, supra,* as to the title to a right of way for a canal, granted by the Congress in 1852, over a reservation occupied by the Chippewa Indians in the state of Michigan. In the course of the opinion, the court, through Mr. Justice White, said: "Whatever the reason, however, for the omission to make mention of the Indian reserve, the power existed in Congress to invade the sanctity of the reservation, and disregard the guaranty contained in the treaty of 1820, even against the consent of the Indians, party to that treaty; and, as the requirement of the grant necessarily demanded the possession of the portion of the reserve through which the canal was to pass, the effect of that Act was to extinguish so much of the Indian reserve as was embraced in the grant to the state for canal purposes." The same conclusion was announced in *Missouri, K. & T. Ry. Co.* v. *Roberts, supra,* with reference to the grant by Congress to the railway company of a right of way through the country of the Osage Indians, in Kansas in 1866. The court there, through Mr. Justice Field, stated the rule as follows: The "grant was absolute in its terms, covering both the fee and possession, and left no rights on the part of the Indians to be the subject of future consideration." Also in the recent case of *Clairmont* v. *United States*, 225 U. S. 551, 56 L. Ed. 1201, 32 Sup. Ct. Rep. 787, it was held that, since the title to the right of way of the Northern Pacific Railway Company through the Flathead Indian reservation had been extinguished by treaty with the Indians, it is no longer Indian country, within the meaning of the Act of Congress of January 6, 1897 (29 Stat. 506, c. 109), prohibiting the introduction of intoxicating liquor into Indian country.

It is entirely competent for Congress, by treaty stipulation with the Indians, where their lands have been allotted to them in severalty under provisions by which they become citizens of the United States, to retain jurisdiction over the allotted

lands for the purpose of preventing the introduction of intoxicating liquors, and this jurisdiction may extend to adjacent lands the title to which is surrendered by the Indians to the United States, until otherwise directed by Congress. The leading case on this subject is *United States* v. *Forty-three Gallons of Whisky*, 93 U. S. 188, 23 L. Ed. 846. This involved the right of traders to introduce intoxicating liquors upon lands which had been ceded to the United States by treaty by the Chippewa Indians in the state of Minnesota. The lands in question were included in an organized county of the state, and were subject for general purposes to the state government. While recognizing the right of the state to assume jurisdiction for other purposes, the court declared that it is competent for the federal government under its treaty-making powers to keep in force upon the ceded lands the legislation of Congress prohibiting the introduction thereon of intoxicating liquors, notwithstanding any law of the state in conflict therewith, without infringing in any way upon the principle of state sovereignty. The court said: "The power to make treaties with the Indian tribes is, as we have seen, coextensive with the power to make treaties with foreign nations. And it cannot be doubted that the treaty-making power is ample to cover all the usual subjects of diplomacy with different powers. One of these subjects relates to the acquisition and distribution of property belonging to the citizens or subjects of each in the territory of the other. A treaty embracing this matter may contravene the statutes of a state; but, if it does, the courts would disregard them and give to the alien the full protection accorded him by the treaty. If this result can be obtained by treaty with a foreign nation, surely the federal government can, in the exercise of its power to treat with Indians, make provision over a subject like the present, coming, as it does, within the clause relating to the regulation of commerce."

In the case of *Dick* v. *United States*, 208 U. S. 340, 52 L. Ed. 520, 28 Sup. Ct. Rep. 399, the court upon the same principle sustained a conviction for a violation of the federal statute by the plaintiff in error (Act July 23, 1892, 27 Stat. 260,

Chap. 234), by introducing intoxicating liquor upon the Nez Perce reservation, in the state of Idaho. The village of Culdesac, where the offense was committed, was a village organized under the laws of Idaho. The lands upon which it was located were a part of the lands ceded to the United States under a treaty with the Indians made in 1893. In this treaty it was stipulated that the ceded lands should be subject to the federal laws prohibiting the introduction of intoxicating liquors into the Indian country for the period of twenty-five years. The court held that, though the title to the lands upon which the village was situated had been transferred to the probate judge of Nez Perce county, the laws of the federal government were, by virtue of treaty, paramount to the authority of the state upon the subject of the introduction and sale of intoxicating liquor.

It will be observed that the court in both these cases distinctly assumed that the power of the state for governmental purposes over lands to which the Indian title has been extinguished is not restricted, except so far as it is limited by the act of extinguishment. Therefore it cannot be controverted, we think, that, subject to the conditions imposed at the time of extinguishment, whether accomplished under the treaty-making power of the federal government or by an Act of Congress, the jurisdiction of the state authorities is extended over all such lands within its limits for all governmental purposes whenever the federal government parts with its title. The owners become subject to the payment of taxes upon them for state purposes (*State ex rel. Commissioners* v. *State Board of Equalization*, 18 Mont. 389, 45 Pac. 553), and hence are entitled to all the rights and privileges of other citizens under the laws of the state. We therefore hold that all persons residing upon the right of way of the Great Northern Railway Company and in the village of Poplar, which adjoins it, who have acquired a residence there and possess the other qualifications necessary to entitle them to vote, are, under the provisions of the state statute, electors, and that it was competent for the board of commissioners to establish a precinct at Poplar

to make it convenient for them to exercise their rights as such. While we think the boundaries of the precinct should not have included any territory other than the granted lands, the fact that it did, did not constitute it a precinct upon an Indian reservation within the meaning of the prohibition of the statute.

It is insisted by counsel for the contestant, however, that, since it is inferable from the evidence that some of the persons who voted at Poplar did not reside either upon the lands granted to the railroad or within the limits of Poplar, it was in any event incumbent upon the contestee to purge the poll or suffer the loss of all votes cast at the precinct. This contention is without merit. The theory of the contestant, as disclosed by his statement, is that the vote cast at Poplar precinct should be rejected as a whole, because, since it was unlawful for the board of commissioners to establish a precinct there, no votes could lawfully be received there, and hence that the judges appointed to hold the election there were guilty of malconduct in opening the polls and receiving votes. In [2] other words, the malconduct charged is the receiving of votes cast in the aggregate, and not in the receiving of any specific number of illegal votes. It was pointed out in *Coleman* v. *Kerr,* 33 Mont. 198, 83 Pac. 393, that, under section 2010 of the Code of Civil Procedure of 1895, malconduct on the part of election officers, as specified in subdivision 1, is a wholly distinct ground of contest from that of reception of illegal votes referred to in subdivision 4, and that, when the latter was stated as the ground of contest, it was incumbent upon the contestant to furnish to the contestee, at least three days before the trial, a written list of the number of votes he deems illegal; otherwise proof of the specific illegal votes cannot be made. (Code Civ. Proc., 1895, sec. 2015.) These provisions are found in the Revised Codes as sections 7234 and 7239, and declare the rule applicable to this case. So far as is disclosed by the record, no such list was delivered to the contestee; hence contestant is not in a position to claim, under the issues as made in his statement, that any number of the votes cast were illegal.

As we read the evidence, it goes no further than to suggest, by the barest inference, that any votes were received which were open to legal objection. Under the provisions cited, the [3] burden was upon the contestant to show that a sufficient number of illegal votes were cast to change the result.

The only other point which we deem it necessary to notice [4] arises upon the ruling of the court in admitting in evidence a copy of the plat of the Poplar town site. When the original plat was filed with the Commissioner of the General Land Office in Washington, a certified copy was filed in the local land office at Glasgow. A similar copy was deposited for filing with the clerk and recorder of Valley county at Glasgow, but had not been marked "filed," because the filing fee had not been paid. The copy from the land office was exhibited to the court, and a certified copy of the copy deposited with the clerk and recorder was offered in evidence by the contestee and admitted over the objection by counsel for the contestant that it was not the best evidence, because not a certified copy of the original by the officer having it in custody. The ruling was error. (Rev. Codes, sec. 7924.) But, in view of the fact that a proper copy could easily be supplied, and that it does not appear that prejudice was wrought, by the use of the copy admitted, we shall not reverse the judgment merely for the purpose of allowing the error in this connection to be corrected.

Other contentions made by counsel are not of sufficient importance to require special notice.

The judgment is affirmed.

*Affirmed.*

MR. JUSTICE HOLLOWAY and MR. JUSTICE SANNER concur.