## SHORE v. SHELL PETROLEUM CORPO-RATION et al., and three other cases.

### Nos. 622–625.

Circuit Court of Appeals, Tenth Circuit.

July 7, 1932.

F. Dumont Smith, of Hutchinson, Kan., and H. R. Spencer, of Duluth, Minn. (Eustace Smith, of Hutchinson, Kan., and John Bradley, F. M. Rogers, and H. W. Goodwin, all of Wellington, Kan., on the brief), for appellants.

Truman Post Young, of St. Louis, Mo., John G. Egan, Asst. Atty. Gen. of the state of Kansas, and Benj. F. Hegler, of Wichita, Kan. (Thompson, Mitchell, Thompson & Young and P. G. McElwee, all of St. Louis, Mo., on the brief for the Shell Petroleum Corporation and Shell Pipe Line Corporation; and Roland Boynton, Atty. Gen. of the state of Kansas, on the brief for the members of the Executive Council of the state of Kansas), for appellees.

Before LEWIS, PHILLIPS, and Mc-DERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

The issue in these cases is, Who owns certain portions of the Arkansas River bed in Sumner County, Kansas,—the State of Kansas or appellants who claim as riparian proprietors. The bills allege that the river has always been non-navigable in its course through Sumner County, that the state's executive council composed of state officers, including the Governor as a member, had given oil and gas leases on the river bed to some of the appellees who had put down wells on the portions of the bed claimed by appel-

**2**

lants, were producing oil therefrom, paying royalties on the oil produced to the State Treasurer and applying the remainder to their own use and benefit. They allege that the leases are clouds on appellants' titles, and ask that they be adjudged owners of the parts of the bed which each claims, that said clouds be removed, that the lessees be held to account to them for oil and gas taken, and that the state executive council, the State Auditor and State Treasurer be enjoined from receiving any of the proceeds from oil and gas produced from the river bed.

The answers admit appellants own land bordering upon the river, deny that they own any part of the river bed, allege that title to the bed is in the state, admit the giving of the leases as alleged in the complaint, the production of oil, and the receipt by the state of royalties thereon, and allege that said leases are valid. They deny that the river has always been non-navigable.

The particular locality in question and around about in wide scope was included in the reservation of the Great and Little Osage Indians pursuant to the treaty of June 2, 1825. 7 Stat. 240. By that treaty the United States gave said tribes a right in and to the reservation "so long as they may choose to occupy the same. * * *" By treaty of September 29, 1865 (14 Stat. 687), the reservation was reduced in area, but the lands here involved and the surrounding country remained within the diminished reservation. By the act of July 15, 1870 (16 Stat. 362), Congress provided for the removal of the Great and Little Osages from Kansas, with their consent, to a permanent home to be provided for them by the United States in the Indian Territory to consist of a tract of land in compact form equal in quantity to one hundred sixty acres for each member of the tribes, or such part thereof as said Indians might desire, to be paid for out of the proceeds of the sales of their lands in the State of Kansas. Not a great while thereafter all of the Indians on the reservation in Kansas were removed to their new home in the Indian Territory, and they have remained there since. Congress then made provision for survey and sale of the Osage lands in Kansas. As shown by an official plat of the survey returned to the General Land Office, the Arkansas River in the locality in question was meandered on both banks. This made the subdivisions bordering on the stream fractional in acreage. They were given lot numbers and so described in government patents when later sold, the acreage being also stated and reference made to the official plat in the General Land Office. One tract here involved was in section thirty-six which had been set aside by the United States to the state as school lands, and the state issued its patent conveying that tract. The earliest of these patents was issued in September, 1872, and the last in July, 1888. Appellants derived their titles from those patentees as remote grantors. No reference is made in any of the patents to the river or its bed,—nothing whatever indicating expressly or impliedly an intention of the United States or the state to convey any part of the river bed.

The acquisition and devolution of titles of the kind here under consideration is a matter within state power and control. In United States v. Cress, 243 U. S. 316, 319, 37 S. Ct. 380, 381, 61 L. Ed. 746, the court said: "The states have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders, both navigable and non-navigable, and the ownership of the lands forming their beds and banks. * * *" In Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 89, 43 S. Ct. 60, 64, 67 L. Ed. 140, the court said this:

"In government patents containing no words showing purpose to define riparian rights, the intention to abide the state law is inferred. Mr. Justice Bradley, speaking for the court in Hardin v. Jordan, 140 U. S. 371, 384, 11 S. Ct. 808, 813 (35 L. Ed. 428), said:

" 'In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the lands lie.' "

It is conceded that in Kansas titles of riparian proprietors extend to the thread of non-navigable streams, and if a river be navigable title to the entire bed vested in the state on its admission into the Union in 1861. It was so held by the Supreme Court of that state in Wood v. Fowler, 26 Kan. 682; and that court has consistently held that the Arkansas River throughout its course in the state is navigable. Dana v. Hurst, 86 Kan. 947, 122 P. 1041; Winters v. Myers, 92 Kan. 414, 140 P. 1033; Steckel v. Vancil, 92 Kan. 591, 141 P. 550; State ex rel. v. Berk, 129 Kan. 645, 284 P. 386. The substance of appellants' contention is that the river is not and never was navigable, that the Kansas Supreme Court erred in fact in hold-

ing it to be or to have been navigable, that the Federal court is not bound by that finding of fact, and its duty in these cases is to make inquiry and determine the fact of navigability or non-navigability. United States v. Holt State Bank, 270 U. S. 49, 46 S. Ct. 197, 70 L. Ed. 465. But the United States is not a party, and appellants' claim of non-navigability at all times refutes any presumption that the United States would ever be interested in the question of title to the bed.

In the several cases in the Supreme Court of Kansas in which that court held the Arkansas River to have been navigable, title to the bed was the issue, and that issue was decided in favor of the state in each case. They establish a rule of property as to the bed of that stream. Moreover, the finding of navigability at an early day can not be said to have been wholly without support in view of the evidentiary and historical facts reviewed at length in the decisions in those cases. In Wear v. Kansas, 245 U. S. 154, 38 S. Ct. 55, 62 L. Ed. 214, Ann. Cas. 1918B, 586, it was held that, if a state court takes upon itself to know without evidence whether a river is navigable, a Federal court can not say it erred. And in Donnelly v. United States, 228 U. S. 243, 262, 33 S. Ct. 449, 455, 57 L. Ed. 820, Ann. Cas. 1913E, 710, the court said:

"But it results from the principles already referred to that what shall be deemed a navigable water within the meaning of the local rules of property is for the determination of the several states."

See, also, Jackson-Walker Coal & Material Co. v. Hodges (D. C.) 283 F. 457. So we apply in this case the rule of property established by the Supreme Court of Kansas.

Appellants also contend they acquired title in fee simple to the bed because it had vested in their grantors, immediate or remote, before statehood. United States v. Holt State Bank, supra. That is, although legal title to the reservation in Kansas was in the United States, appellants say the equitable fee title, including the river bed, was in the Indian tribes or nations, and the patents to appellants' grantors conveyed that title. This in our opinion is not only in contradiction of the rule of property in Kansas, but also contrary to the plain intent of the treaty of June 2, 1825. At the time the treaty was entered into these tribes occupied a reservation which included lands in the State of Missouri and the Territory of Arkansas, extending thence far westward including lands now in the southerly part of Kansas and northerly part of Oklahoma. By the treaty the Osages ceded and relinquished to the United States all of that reservation, and in part consideration therefor the United States reserved, set apart, what later was known as the Kansas Reservation in which the Indians were given only the right of occupancy so long as they might choose to remain; and as already said they later chose to go elsewhere, which was a surrender and abandonment of the only right given to them by the treaty. The fact that the United States later agreed to account to the tribes on sale of the Kansas lands at the rate of $1.25 per acre is no evidence of Indian title, when the policy and practice of the Government in its transactions and dealings with such people is borne in mind. Article 1 and the relevant part of article 2 of said treaty are as follows:

"In order more effectually to extend to said Tribes that protection of the Government so much desired by them, it is agreed as follows:

"Article 1.

"The Great and Little Osage Tribes or Nations do, hereby, cede and relinquish, to the United States, all their right, title, interest, and claim, to lands lying within the State of Missouri and Territory of Arkansas, and to all lands lying West of the said State of Missouri and Territory of Arkansas, North and West of the Red River, South of the Kansas River, and East of a line to be drawn from the head sources of the Kansas, Southwardly through the Rock Saline, with such reservations, for such considerations, and upon such terms, as are hereinafter specified, expressed, and provided for.

"Article 2.

"Within the limits of the country, above ceded and relinquished, there shall be reserved, to, and for, the Great and Little Osage Tribes or Nations, aforesaid, so long as they may choose to occupy the same, the following described tract of land." (A description of the so-called Kansas Reservation follows.)

Nowhere in this treaty can anything be found indicating an intention to vest title of any sort in these tribes.

In United States v. Cook, 19 Wall. 591, 593, 22 L. Ed. 210, the suit was against Cook for saw-logs purchased by him from Indians who had cut and taken them from a reservation in which they had only the right of occupancy, title to the land being in the United States. The court in holding Cook

**4**

liable said: "The possession, when abandoned by the Indians, attaches itself to the fee without further grant." See, also, on the subject Spalding v. Chandler, 160 U. S. 394, 402, 403, 16 S. Ct. 360, 40 L. Ed. 469; Jones v. Meehan, 175 U. S. 1, 8, 9, 20 S. Ct. 1, 44 L. Ed. 49; Nadeau v. Union Pacific R. Co., 253 U. S. 442, 445, 446, 40 S. Ct. 570, 64 L. Ed. 1002. Mr. Justice Brewer, when a member of the Kansas Supreme Court, discussed at some length in Veale v. Maynes, 23 Kan. 1, the reasons, policy, and practice of the United States in withholding from Indian tribes titles to their reservations.

The decrees of dismissal on final hearings are affirmed.