No. 34,666

BERNARD A. HERKEN, *Appellee,* v. JOHN T. GLYNN, *Appellant.*

(101 P. 2d 946)

Opinion filed May 4, 1940.

*Benjamin F. Endres,* of Leavenworth, for the appellant.

*Max F. Frederick,* of Leavenworth, *E. R. Sloan, W. Glenn Hamilton, Floyd A. Sloan* and *Eldon R. Sloan,* all of Topeka, for the appellee.

*Jay S. Parker,* attorney general, and *E. V. Bruce,* assistant attorney general, as *amici curiae.*

The opinion of the court was delivered by

THIELE, J.: This was an action to contest an election for county treasurer of Leavenworth county. Within the limits of Delaware township in that county is a tract of land of over 642 acres on which is located a national home for disabled soldiers, the exact name of which is not important, and which generally will be referred to as the soldiers' home. By action which will be referred to later, three voting precincts were established at the soldiers' home, and the prin-

cipal question here involved is the right of the persons residing at the home to vote as electors of Leavenworth county.

At the election November 8, 1938, votes were cast and received at the above three precincts, as well as at other precincts in the county. Thereafter the board of county commissioners, as the canvassing board, performed its duties and declared that Herken had received a total of 7,211 votes and Glynn had received a total of 7,283 and Glynn was declared elected by a majority of 72 votes. Herken instituted a contest under proceedings of which no complaint is made, the burden of his complaint being that in the three precincts at the soldiers' home and subsequently counted by the canvassing board were 496 votes cast for Herken and 581 votes cast for Glynn; that the voters at those precincts were not qualified electors of Delaware township and their purported votes should not be counted, and if not counted he would be the legally elected county treasurer. On December 28, 1938, the contest court gave judgment for Glynn and on January 5, 1939, Herken served his notice of appeal and filed the same with the county clerk. On June 6, 1939, a transcript of the contest court proceedings was filed in the district court and on the same day a bond was given by Herken to pay the costs if the same be adjudged against him. On June 21, 1939, the contestee filed his motion to dismiss the appeal for the reason the contestor failed to perfect his appeal as required by law and the court was without jurisdiction. On the same day the motion was presented to the court and evidence was taken that no deposit for costs had been made and that the bond had been given. The district court denied this motion and that ruling is assigned as error.

If there was error, it disposes of this appeal, so we will consider it before going to the merits.

There is no specific provision of statute for appeals from the judgment of a contest court under the circumstances here obtaining. In *Berglund v. Hanna*, 149 Kan. 500, 504, 87 P. 2d 581, it was held that a contest court is a tribunal exercising judicial functions and inferior in jurisdiction to the district court. In G. S. 1935, 60-3308, it is provided that:

"Appeals to courts other than the supreme court shall be taken and proceedings therein had in the same manner as is herein provided for appeals to the supreme court, except where special provision with reference to such appeals is made by statute."

And in G. S. 1935, 60-3825, that:

"The judges of the supreme court may make and amend, from time to time,

such further rules for the regulation of procedure in the supreme court and inferior courts consistent with this code, as they may deem proper."

Acting under authority of the last-quoted section, this court has promulgated its rule No. 2, which provides that when the clerk of a trial court shall transmit a certified copy of the notice of appeal and accompanying papers to the clerk of this court, the cause shall be docketed at once, but an order of dismissal shall be entered by the clerk unless deposit of $25 advance fee be made within thirty days, etc.

Appellant directs our attention to *Pee v. Witt*, 100 Kan. 171, 163 Pac. 797, where it was held a cash deposit is not a substitute for a bond; to *Auto Trunk Co. v. Hahn*, 138 Kan. 36, 23 P. 2d 585, where it was held the bond was legally insufficient, and to other similar cases, and insists that because no cash deposit was made the district court acquired no jurisdiction. In those cases the giving of a legally sufficient bond at the time of appeal was necessary in order to perfect the appeal. In the case at bar, applying the analogy of the rule of this court for appeals from the district court to this court, the appeal was perfected when the notice was given and the record was certified to the district court, and Herken had thirty days in which to deposit the advance fee for costs. By reference to the dates above shown, it will be seen that before that time had expired, Glynn had filed his motion to dismiss and it had been denied. We are not advised what reason, if any, was assigned for its ruling by the district court, but it is clear the motion was prematurely filed, and the ruling was correct for that reason if for no other. Thereafter the motion was not renewed nor was the district court's attention again directed to the matter, nor did the clerk dismiss the action, but the action proceeded and was ultimately heard and determined. Under the facts we cannot say the district court was without jurisdiction, nor will we say failure to make a cash deposit within the thirty-day period was fatal. We need not consider the power of the district court to waive strict compliance with the rule as to a costs deposit, for that is not discussed. It is well known, however, that on occasions where poverty and present inability to comply are involved, the requirement of the rule is frequently waived in this court. As bearing on the question see *Obertino v. Mining Co.*, 87 Kan. 297, 124 Pac. 172.

At the trial in the district court, Herken offered in evidence the deeds showing conveyance of the real estate on which the soldiers' home is situated, and the records showing canvass of the election

returns, etc. Glynn's demurrer to this evidence was overruled and that ruling is assigned as error. Glynn offered no evidence. Thereafter the trial court made findings of fact covering the acquisition of the real estate on which the soldiers' home is situated, and the various laws enacted by the United States and the state of Kansas applicable thereto. It also made findings concerning the election and the vote for county treasurer in the county as a whole and in the three precincts at the soldiers' home, and that a list of the persons voting in such precincts was attached to contestor's statement of intention to contest "and said persons were on the date of the election residents of said precincts and claimed their right to vote at such election by reason of their residence in such precincts." The conclusions of law are summarized, viz.: The state ceded exclusive jurisdiction, with certain exceptions, to the United States and the land (on which sholdiers' home is situated) was not a part of the state of Kansas on November 8, 1938; the state had no legal right to enter upon the ceded territory and attempt to hold an election, the persons living on the ceded territory were not residents of Kansas, or of Delaware township in Leavenworth county, and the ballots cast by them were void and should not be counted for either party; that Herken received 6,715 legal votes and Glynn received 6,702 legal votes and Herken was the duly elected county treasurer. Judgment was entered accordingly. Glynn's motion for a new trial was denied and he appeals.

There is no dispute concerning the facts here summarized from the trial court's findings. In 1866 the congress first made provision for establishments for the care and relief of disabled volunteer soldiers of the United States army, the act being amended in 1873. These establishments were to be known as "The National Home for Disabled Volunteer Soldiers" (24 U. S. C. A. §§ 71-77). By an act of July 5, 1884, the congress authorized location of a branch in either of several states, including Kansas, to be located on a tract of not less than 320 acres. By a conveyance made November 21, 1884, a tract of 320 acres in Leavenworth county was conveyed to "The National Home for Disabled Volunteer Soldiers," a corporate body, and shortly thereafter a home was begun and erected by the United States and has been kept and maintained to the present time. It may here be noted that by a deed made November 21, 1904, to the same grantee, an additional two and one-half acres was conveyed. By Laws 1885, chapter 136, the legislature of Kansas ceded to the United States exclusive jurisdiction over and within all

the territory described in the first deed above mentioned, saving to the state the right to serve civil and criminal process, and to levy and collect certain taxes, as more particularly. referred to in that statute. In 1901 the congress passed an act by which jurisdiction over the home in Leavenworth county, Kansas, was ceded to Kansas and relinquished by the United States, and that the United States shall claim or exercise no jurisdiction thereover after March 3, 1901, save in certain particulars not here important. Since the year 1902 members of the home residing and living upon the territory above described have voted at the regular elections held in the state of Kansas and in Leavenworth county for the election of state and county officers. In 1906 the board of county commissioners passed a resolution establishing the three voting precincts at the soldiers' home, the vote from which is here in question. In 1927 the state legislature passed an act (Laws 1927, ch. 206) which is briefly summarized. By section 1 the state consented to the acquisition by the United States of any lands in Kansas which had been or might thereafter be acquired for purposes mentioned in art. I, sec. 8, par. 17, U. S. constitution. By section 2 the state ceded exclusive jurisdiction over any lands so acquired to the United States for all purposes, saving to the state the right to serve therein civil or criminal process and the right to tax certain property. Section 3 provided jurisdiction ceded should not vest until the United States had acquired title. By an act of congress it was declared that all property, the title to which on July 31, 1930, stood in the name of the board of managers of the National Home for Disabled Soldiers, should be transferred to and vested in the United States. Provisions for clearing the titles so vested are here immaterial (July 3, 1930, c. 863, sec. 3, 46 Stat. 1016; U. S. C. A. Tit. 38, ch. 1a, sec. 11b). The findings with reference to the vote cast in the three precincts have been noted heretofore. The trial court also referred in its findings to Laws 1909, chapter 133, section 1 (G. S. 1935, 25-109), which provided that expenses of an election at precincts on the grounds of a national soldiers' home should be paid by the county and not by the township in which it was located. The particular section was amended by Laws 1939, chapter 187, but the amendment did not change the above provision.

The specific question is whether a resident at the soldiers' home located within the exterior borders of Kansas, is a resident of Kansas and as such entitled to the right of franchise. Certain things

may well be restated and made clear at the beginning of any discussion of the legal questions involved.

The first is that it must be assumed, as the trial court found, that the persons voting at the three soldiers' home precincts were residents of Leavenworth county, Kansas, otherwise they had no right under any circumstances to vote for county treasurer in that county. It is therefore immaterial to our discussion what may have been their previous place of residence or where they might, at some other times, have been privileged to vote.

The second is the factual situation. To repeat—the land for the soldiers' home was acquired in 1884; in 1885 the state ceded exclusive jurisdiction, with certain exceptions as to service of process and right of taxation, to the United States; in 1901 the United States ceded the jurisdiction back to the state; in 1927 the state again ceded the jurisdiction to the United States, with certain exceptions, and effective when the United States acquired title, and that the United States acquired title in its own name and not in the name of the home in 1930. It is important, also, to bear in mind the provision of our state constitution, article 5, section 1, that every citizen of the United States, of the age of twenty-one years, who has resided in the state for six months and in the township or ward thirty days next preceding the election at which he offers to vote, is a qualified elector, as well as the provisions of the fourteenth amendment to the constitution of the United States that every person born or naturalized in the United States is a citizen of the United States and of the state where he resides.

The questions presented by this appeal find their basis in the force and effect which must be given to article I, section 8, clause 17, of the constitution of the United States, wherein it is provided that the congress shall have power:

"To exercise exclusive legislation in all cases whatsoever, over such District [District of Columbia] and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings."

Without elaboration, it may be said it has been held that the term "exclusive legislation" carries with it "exclusive jurisdiction," and that a soldiers' home is within the term "other needful buildings." The question of the extent of jurisdiction of the federal government, and the power of the state to legislate in a particular

case, has been before the federal and state courts in many instances arising under a variety of circumstances. The briefs cite and our research discloses but a few cases dealing with the right to vote at a state election of a person residing on lands within the state which the state has ceded to the United States.

In authorities treating the matter generally, it is said that where a cession of a tract is made by a state to the United States for the purposes mentioned in the above constitutional provision, and there is no reservation of jurisdiction by the state other than the right to serve civil and criminal process on the ceded lands, persons who reside on such lands do not acquire any elective franchise as inhabitants of the ceding state. (See *McCrary on Elections*, 4th ed., § 89, p. 68; *Paine on Elections*, § 63, p. 44; *Kennan on Residence and Domicile*, § 493, p. 844; 20 C. J. [Elections, § 33] p. 74; 18 Am. Jur. [Elections, § 66] p. 224.)

A reference to the authorities above mentioned will show the statements therein are supported by citation to one or more of the five cases next mentioned.

As provided by the laws of Massachusetts, in 1841, its house of representatives requested the opinion of the supreme court on four questions pertaining to the rights of residents on lands ceded to the United States for purposes mentioned in the constitution, one question being whether persons so residing were entitled to the elective franchise. The answer is reported in *Opinion of the Justices*, 42 Mass. (1 Metc.) 580, where, after stating the propositions submitted, and reviewing the facts as to cession, and citing some earlier Massachusetts cases, it was said:

"Without stating these cases particularly, we are of opinion that where the general consent of the commonwealth is given to the purchase of territory by the United States, for forts and dock yards, and where there is no other condition or reservation in the act granting such consent, but that of a concurrent jurisdiction of the state for the service of civil process, and criminal process against persons charged with crimes committed out of such territory— the government of the United States have the sole and exclusive jurisdiction over such territory, for all purposes of legislation and jurisprudence, with the single exception expressed, and consequently, that no persons are amenable to the laws of the commonwealth for crimes and offenses committed within said territory, and that persons residing within the same do not acquire the civil and political privileges, nor do they become subject to the civil duties and obligations of inhabitants of the towns within which such territory is situated. . . . We proceed to apply the opinion, thus stated, to the questions specifically proposed by the honorable House of Representatives. . . .

"4. We are also of opinion that persons residing in such territory do not

thereby acquire any elective franchise as inhabitants of the towns in which such territory is situated." (pp. 582-584.)

In *Sinks v. Reese*, 19 Ohio St. 306 (decided in 1869), the appeal was from an election contest in which the question was the right of a resident of "the national asylum for disabled volunteer soldiers," located in Montgomery county, to vote for county clerk. The court reviewed the statutes of the United States, the constitutional provision, the consent of the state to the cession, and held:

"1. Asylums for disabled volunteer soldiers of the United States are among the 'needful buildings' for the erection of which the government of the United States, through the medium of a corporation created by itself or otherwise, may purchase and hold territory, under the provisions of article 1, section 8, of the constitution of the United States.

"2. When territory for such purpose is so purchased by 'the consent of the legislature of the state in which the same shall be,' the government of the United States is invested, under the provisions of the same section, with exclusive jurisdiction over the same and its appurtenances, in all cases whatsoever.

"3. The inmates of such an asylum, resident within such territory, being within the exclusive jurisdiction of a government other than that of the state within whose boundaries such asylum or territory may be situate, are not residents of such state, within the meaning of article 5, section 1, of the constitution of Ohio; and where the constitution of such state confers the elective franchise upon residents thereof alone, the inmates of such asylum, resident within such territory, are not entitled to vote at any election held within and under the laws of such state." (Syl. ¶¶ 1, 2, 3.)

The right to vote of residents on the United States Reservation at West Point, in New York state, was before the court in *"In re Town of Highlands"* (decided in 1892), and reported in 22 N. Y. S. 137, 48 N. Y. S. Rep. 795, where it was held:

"Since the state of New York has ceded to the United States the territory comprising the West Point Reservation, reserving nothing except the right to serve process therein, such territory has ceased to be subject to state jurisdiction, or to be a part of the state; and persons having no other qualifications as residents than a residence in such territory are not residents of the state, and have no right to vote." (Syl. ¶ 1.)

A similar question came before the court in *McMahon v. Polk*, 10 S. D. 297, 73 N. W. 77, 47 L. R. A. 830 (decided in 1897), and it was held:

"A person, though not in the army or navy, cannot by long and continuous residence within the boundaries of a reservation, the jurisdiction whereof is ceded to the United States (Const. art. 26, § 18), acquire the right to vote at a state election held in the county wherein such reservation is situated." (Syl. ¶ 5.)

In *State, ex rel., v. Willett,* 117 Tenn. (9 Cates) 334, 97 S. W. 302 (decided in 1906), is a review of the law pertaining to the right of franchise of persons resident on lands ceded to the United States, in which most of the authorities above noted are cited, and it was said:

"If, as we have held, and as controlling authorities elsewhere hold, the United States has exclusive jurisdiction over the land on which the Soldiers' Home in question was erected, then the residents in that home are non-residents of the state of Tennessee, and cannot fall within the requirements for legal voters laid down by our constitution." (p. 346.)

Each of the above cases cites one or more of the preceding cases, and those thereafter decided refer to *Fort Leavenworth R. R. Co. v. Lowe,* and *Chicago & Pacific Railway Co. v. McGlinn,* both of which arose in this state, reached the supreme court of the United States and are hereafter referred to. It may be said that the thread of reasoning running through the election cases is that a person by becoming a resident on lands ceded by a state to the United States, becomes subject to the exclusive jurisdiction of the United States and is no longer a resident of the state in which the lands ceded are situate. We find three other election cases treating the question of jurisdiction, but the claim of exclusive jurisdiction of the United States was not sustained for reasons stated.

In *Renner v. Bennett,* 21 Ohio St. 431, one of the questions was whether, cession having been made to the United States, jurisdiction could be relinquished to the state, and it arose in an election contest case. Without pursuing the reasoning of the case, we note the holding as shown by paragraphs 2 and 3 of the syllabus, viz:

"2. Where such purchase is made with the consent of the state, or even with an express cession of jurisdiction by the state, congress has power to relinquish, or re-cede to the state the jurisdiction thus acquired, without abandoning the property or its legitimate use.

"3. A jurisdiction thus acquired from a state, although exclusive while it subsists, is to be regarded as a mere suspension of the state jurisdiction, and, therefore, an act of congress relinquishing such jurisdiction, and re-ceding it to the state, is effective for that purpose, without any acceptance or assent by the state."

The right of a person, resident on a reservation under claimed jurisdiction of the United States to vote at a state election, was considered in *Stephens v. Nacey,* 49 Mont. 230, 141 Pac. 649. The case involved a town on an Indian reservation, jurisdiction over which had been retained by the United States, when the state was

admitted to the Union. Thereafter the United States granted a
right of way across the reservation to a railroad company, and
thereafter by direction of the Secretary of the Interior a part of
the grant and some additional land was platted as a townsite and
sold. Residents on these lots were held not disqualified from voting,
and that although the town had been establishd on the reservation,
the effect was not to make residents of the town residents on the
reservation. Without pursuing the matter fully, it was held that
the grant to the railroad company, the establishment of the town
and sale of lots, extinguished the Indian title. The general question
of jurisdiction as presented in the case at bar was not discussed.

In *Porter v. Hall*, 34 Ariz. 308, 271 Pac. 411, it was contended
that Indians resident on a certain reservation had been extended
rights of citizenship and were eligible to register as voters. The
court held the Indians remained wards of the United States and
for that reason were not entitled to vote.

No case has been found where it has been held that residents on
lands ceded by a state to the United States retained or acquired a
right to vote as residents of the ceding state.

Appellant in effect contends that persons resident within the con-
fines of the territory now included in the soldiers' home, if other-
wise qualified, who had an undisputed right to vote prior to the
original cession in 1884, certainly had that same right after re-
cession in 1901, and that the second cession to the United States
in 1927 did not cut off that right; that the act of cession did not
take away the right, and it persists to this day; that the state had
a concurrent jurisdiction over the ceded territory, and until the
United States legislated, the state law remained in full force and
the right of the inhabitants to vote was unimpaired. He directs
our attention to *Craig v. Craig*, 143 Kan. 624, 56 P. 2d 464. There
the question was the right of a resident on an army post or reserva-
tion within this state to maintain an action for divorce in an ad-
joining county under the proviso in G. S. 1935, 60-1502. In
answering a contention the legislature had no authority to legislate
concerning the subject of divorce as applied to residents on the
reservation, the rule was stated that until state laws are superseded
by appropriate legislation of the United States, the validity of ex-
isting state legislation should be sustained, and that although juris-
diction had been ceded to the United States, congress was not
obliged to exercise its jurisdiction, and until existing laws were

abrogated or superseded by it, the state law remained in force and unimpaired. In that case reference is made to many of the decisions hereafter mentioned.

The question of jurisdiction as between this state and the United States, insofar as the military reservation at Leavenworth is concerned, was before this court in the two cases next mentioned. Appeals to the supreme court of the United States resulted in decisions which are often cited as leading cases.

In *Ft. L. Rld. Co. v. Lowe, Sheriff*, 27 Kan. 749 (decided in 1882), this court held, that the state had power to tax railroad property lying within the boundaries of the Fort Leavenworth military reservation. The cause was taken to the supreme court of the United States on writ of error (*Fort Leavenworth R. R. Co. v. Lowe*, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264). In the opinion by Field, J., will be found an extended discussion of the question of jurisdiction over lands ceded to the United States. Limits of space do not permit a review of what was there said. Reference was made to the opinions in 1 Met. 580 and 19 Ohio St. 306, above referred to, as well as others, and it was said that they were—

"Sufficient to support the proposition which follows naturally from the language of the constitution that no other legislative power than that of congress can be exercised over lands within a state purchased by the United States with her consent for one of the purposes designated; and that such consent under the constitution operates to exclude all other legislative authority." (p. 537.)

In discussing a contention the state had no power to make cession, the court held that it did have such power and further—

"In their relation to the general government, the states of the Union stand in a very different position from that which they hold to foreign governments. Though the jurisdiction and authority of the general government are essentially different from those of the state, they are not those of a different country; and the two, the state and general government, may deal with each other in any way they may deem best to carry out the purposes of the constitution. It is for the protection and interests of the states, their people and property, as well as for the protection and interests of the people generally of the United States, that forts, arsenals, and other buildings for public uses are constructed within the states. As instrumentalities for the execution of the powers of the general government, they are, as already said, exempt from such control of the states as would defeat or impair their use for those purposes; and if, to their more effective use, a cession of legislative authority and political jurisdiction by the state would be desirable, we do not perceive any objection to its grant by the legislature of the state. Such cession is really as much for the benefit of the state as it is for the benefit of the United States.

It is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the state." (p. 541.)

In *C. R. I. & P. Rly. Co. v. McGlinn* (decided in 1882), 28 Kan. 274, the question before this court was the liability of the company to the owner of livestock killed on the right of way across the Fort Leavenworth military reservation. In deciding that the state statute was effective, this court said:

"*It is the rule, as we understand it, that all laws and municipal regulations in force at the time any territory is ceded by one power to another power or jurisdiction remain in force until changed by the new sovereign authority,* unless such laws and regulations are inconsistent or in conflict with the existing laws of the new power taking possession of the ceded territory. It follows from this that even conceding the validity of the act of February 22, 1875, ceding to the United States the Fort Leavenworth reservation, and conceding that the United States has legally accepted the grant, the act of 1874 is operative over the reservation, because such act has not been abrogated by congress, nor is it inconsistent with any legislation of that body. (*Cass v. Dillon,* 2 Ohio St. 607; *U. S. v. Power's Heirs,* 11 How. 570. See *Fort Leavenworth R. Co. v. Lowe,* supra.)" (p. 277.) (Italics ours.)

This case likewise reached the supreme court of the United States (*Chicago & Pacific Railway Co. v. McGlinn,* 114 U. S. 542, 5 S. Ct. 1005, 29 L. Ed. 270), where the decision of this court was affirmed. In the opinion reference was made to the holding in the Lowe case, *supra,* and it was further said:

"Upon the second question the contention of the railroad company is that the act of Kansas became inoperative within the reservation upon the cession to the United States of exclusive jurisdiction over it. We are clear that this contention cannot be maintained. *It is a general rule of public law, recognized and acted upon by the United States, that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country, that is, laws which are intended for the protection of private rights, continue in force until abrogated or changed by the new government or sovereign. By the cession public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions, and constitution of the new government are at once displaced.* Thus, upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion, or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on

other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general, that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed. (*American Insurance Co. v. Canter*, 1 Pet. 542; Halleck, International Law, ch. 34, § 14.) . . . *It is true there is a wide difference between a cession of political jurisdiction from one nation to another and a cession to the United States by a state of legislative power over a particular tract, for a special purpose of the general government; but the principle which controls as to laws in existence at the time is the same in both.* . . ." (pp. 546, 547.) (Italics inserted.)

The matter of jurisdiction over the Fort Leavenworth reservation and the force and effect to be given the laws of Kansas in an action for wrongful death which occurred on the reservation came before this court in the later case of *Hoffman v. Power Co.*, 91 Kan. 450, 138 Pac. 632 (decided in 1914), where the rule of the McGlinn case was approved and followed.

From the above it appears the rule is as stated in 65 C. J. 1258 [United States, § 7], viz.:

"When jurisdiction is ceded, the municipal laws of the state, except insofar as they are inconsistent with the laws of the United States, remain in force until abrogated by the United States, but this includes only such laws as are in effect at the time of the cession. . . ."

That leads to a consideration of what is included in the term "municipal law," and the nature of the right to vote. The term "municipal law" has been defined to be a rule of civil conduct prescribed by the supreme power of the state (*Sevier v. Riley*, 198 Cal. 170, 244 Pac. 323, 325), and a similar definition may be found in *Merchants Exchange v. Knott*, 212 Mo. 616, 111 S. W. 565, 571, where it is said the definition is a part of Blackstone's definition which adds that it is "commanding what is right and prohibiting what is wrong." The latter part of the definition is used to define the term in 36 C. J. [Law, § 12], p. 961, which also states it is: ". . . that which pertains solely to the citizens and inhabitants of a state, and is thus distinguished from political law and commercial law. . . ."

A political right has been defined as consisting of the right and power to participate in the establishment or management of government, to exercise the right of suffrage, and to hold office. (See *State, ex rel., v. Huston*, 27 Okla. 606, 113 Pac. 190, 198; *Friendly*

*v. Olcott,* 61 Or. 580, 123 Pac. 53, 56; *Haupt v. Schmidt,* 70 Ind. App. 260, 122 N. E. 343; *State v. Collins,* 69 Wash. 268, 124 Pac. 903; *People v. Barrett,* 203 Ill. 99, 67 N. E. 742, 743.) The right to vote has been said to be a political right or privilege (McCrary on Elections, 4th ed., p. 5 *et seq.;* Paine on Elections, p. 2), and that it is not included among the rights of property or person (18 Am. Jur. [Elections, § 44], p. 209, and 20 C. J. [Elections, § 13], p. 60). It would seem to follow that the right to vote was not included under the term "municipal law" and, not being so included, would not be such a right or privilege that it would persist in the residents of a territory the jurisdiction over which has been ceded to another sovereignty.

We have not overlooked the case of *Cory v. Spencer,* 67 Kan. 648, 73 Pac. 920, to which our attention has been directed. In that case it was held that a member of the soldiers' home was not deprived of the right to acquire a residence there for voting purposes. That case was decided in 1903, at which time, under the act of congress heretofore noted, jurisdiction over the home had been relinquished to the state. The question of jurisdiction of the United States was not involved nor discussed, as the recession made it immaterial. (See *Renner v. Bennett,* supra.) Nothing said in the Cory case is conclusive in the case at bar.

Some argument is made that our conclusion will result in disenfranchising those persons who reside at the soldiers' home. Such a result does not follow. Under article 5, section 3, of our state constitution, it is provided that—

"For the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence . . . while kept at any . . . asylum at public expense."

Under that provision there is no reason why any person, resident in the state of Kansas before entering the soldiers' home, may not vote at his former place of residence, if he is otherwise qualified. Indeed, that is the only place he can legally vote (*Campbell v. Ramsey,* 150 Kan. 368, 92 P. 2d 819). And he need not go there personally to vote; he can cast his ballot as an absentee voter under appropriate statutes (*Lemons v. Noller,* 144 Kan. 813, 63 P. 2d 177). Persons who enter the soldiers' home from other states are protected by the laws of the state from which they came. In the absence of any showing to the contrary, and there is none, we assume they have the same right to cast absentee ballots as do residents of this

state, absent from the state. Any conclusion other than we have reached would permit a resident of the home, regardless of the state from which he came, after being at the home six months, not only to vote for any elective officer of Delaware township, but of Leavenworth county, and of the state, as well as for congressman and United States senators, and to be candidates for any of such offices. We are of the opinion they do not have such right, and that when the several persons voted at the election in 1938 they attempted to exercise a political right they did not have.

To recapitulate, when the United States relinquished jurisdiction to the state of Kansas in 1901, the right of persons residing at the soldiers' home to vote as residents of Kansas was established by the laws of Kansas, and when the board of county commissioners of Leavenworth county, in 1906, established the three voting precincts at the home, it lawfully did so. But after the passage of Laws 1927, ch. 206 (G. S. 1935, 27-101 *et seq.*), and the action of the United States in acquiring title in 1930, if it did not previously have it, the jurisdiction was in the United States, and residents at the home could no longer exercise the political right to vote as residents of the state of Kansas at the particular precincts.

We note the trial court in its conclusions of law used the language found in some of the cases cited, and held "the persons living on the ceded territory were not residents of Kansas." That statement is too broad. Residence at the home is not sufficient to confer the right to vote as a citizen of Kansas, but as has been pointed out, if a particular person was a resident of Kansas at the time he entered the home, he is not to be deemed to have lost his residence because he entered the home. Under such circumstances, he is still a resident of Kansas for the purpose of exercising the elective franchise at the place from which he came. The votes cast at the particular three precincts were all illegally cast, and the trial court rightly concluded they should not be counted.

The judgment of the trial court is affirmed.

DAWSON, C. J. (concurring): I concur in the majority opinion, but wish to add that even if the law books were not laden with decisions in analogous cases, and if the vital question in this lawsuit had to be decided wholly on principle and not at all on precedent, I would hold that citizens who come from all parts of the country to enjoy the hospitality of a generous government at its National

Home for Disabled Volunteer Soldiers, in Leavenworth county, do not thereby lose their voting residence in the place from whence they came, nor do they thereby acquire the rights of voters in any election governed by Kansas law. .

HARVEY, J. (dissenting): The judgment of the trial court is based solely on its conclusion of law, restated in varied forms, that the land constituting the soldiers' home "was not a part of the state of Kansas" when the election in question was held. With this conclusion of law we cannot agree. The boundaries of the state of Kansas, set out in the preamble of our constitution, were fixed by the act of congress which admitted the state of Kansas into the Union (12 Stat. 126, G. S. 1935, p. LXXVIII). Section 1 of the act. reads:

"That the state of Kansas shall be, and is hereby declared to be, one of-the United States of America, and admitted into the Union on an equal footing with the original states in all respects whatever. And the said *state shall consist of all the territory included within the following boundaries,* to wit: Beginning at a point on the western boundary of the state of Missouri, where the thirty-seventh parallel of north latitude crosses the same; thence west on said parallel to the twenty-fifth meridian of longitude west from Washington; thence north on said meridian to the fortieth parallel of latitude; thence east on said parallel to the western boundary of the state of Missouri; thence south with the western boundary of said state to the place of beginning: *Provided, That nothing contained in the said constitution respecting the boundary of said state shall be construed* to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or *to include any territory which by treaty with such Indian tribe, is not without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the state of Kansas,* until said tribe shall signify their assent to the president of the United States to be included within said state, or to affect the authority of the government of the United States to make any regulation respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent to make if this act had never passed." (Italics inserted.)

Construing this provision, it has been held that the state laws . prevailed over Indian lands in the state where there were no provisions in the Indian treaty that the land should not be included within the boundaries of a state (*McCracken v. Todd,* 1 Kan. 148; *The United States agt. John Ward,* McCahon 199 [U. S. Circuit Court]), and that the state laws prevailed over Fort Leavenworth

(*Clay v. The State*, 4 Kan. 49, 56), and Fort Harker (*United States agt. George Stahl*, McCahon 206 [U. S. Circuit Court]).

There is no contention that the soldiers' home land was excluded from the boundaries of the state of Kansas by the act admitting the state into the Union. It was argued, however, that this result follows from chapter 206, Laws of 1927, which will be noted later, and article 1, section 8, clause 17, of the federal constitution, which reads:

"To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings;—And."

This clause was not in the original draft of the constitution (2 Story on Constitution, 5th ed., 127, § 1217), but a committee to draft and report it was appointed. It was prompted by the following incident: At the close of the War of the Revolution the continental congress, then sitting at Philadelphia, was surrounded and insulted by a small but insolent band of mutineers of the continental army. Congress applied to the executive authorities of Pennsylvania for defense, but that was a cumbersome body and acted so slowly that congress indignantly removed to Princeton, N. J., where it was welcomed and protected. (Rawle on Constitution, 2d ed., p. 112.) Its principal purpose, as shown by the writings of Story, Rawle and others, was to have an area for the federal government building, respecting which congress alone had authority to legislate. The provision that congress could exercise like authority over the places purchased by the consent of the legislatures of the states in which the same shall be for the erection of forts, magazines, arsenals, dock yards and other needful buildings, but little discussed by the authorities above mentioned, appears to have been added with the thought that congress could acquire land within a state only with the consent of the state (*Fort Leavenworth R. R. Co. v. Lowe*, 114 U. S. 525, 29 L. Ed. 264). As we have seen, it did not do so with respect to forts, etc., in Kansas when it was admitted into the Union.

It will be observed that this is one of the powers of congress. The provision, at most, gave congress authority "to exercise exclusive legislation in all cases whatsoever" over such places. Naturally, the grant of such authority is a force only when and to the extent it is exercised.

It is said by some authorities that exclusive jurisdiction neces-

sarily follows exclusive legislation. That is a short cut, and the statement may be deceiving. Jurisdiction pertains to the power of courts to interpret and apply laws, and results from article 3 of the United States constitution (Rawle on the Constitution, 2d ed., pp. 114, 199-208, 220). In *Hepburn and Dundas v. Ellzey* (6 U. S. [2 Cranch.] 445, 2 L. Ed. 332), the question arose whether residents of the District of Columbia could maintain an action in the circuit court of the United States for the district of Virginia against a citizen of Virginia. Marshall, chief justice, speaking for the court, pointed out that the District of Columbia is not a state, in the sense that word is used in the constitution; that the word "state," as used in the constitution, referred to the members of the American Confederacy; that whether a resident of the District of Columbia could maintain an action in the United States circuit court for Virginia "depends on the act of congress describing the jurisdiction of that court," and after pointing out some disadvantages in that respect, said: "But this is a subject for legislation, not for judicial consideration." So, to what extent the federal government has jurisdiction over a particular tract, or the residents thereof, depends upon the acts of congress pertaining thereto which are authorized by the constitution.

The district for the permanent seat of the government of the United States, as contemplated by article 1, section 8, clause 17, of the federal constitution, was formulated by an act of the legislature of Virginia of December 3, 1789 (13 Henning's Stat. at Large 43), and the act of the legislature of Maryland of December 23, 1788 (1 Kilty 187), and supplemental acts of 1791, 1792 and 1793 (2 Kilty, pp. 315, 392, 450), by acts of congress of July 16, 1790 (1 Stat. 130), and March 3, 1791 (1 Stat. 214), and by proclamations of the president of January 24 and of May 30, 1791. An examination of these instruments makes it clear the states intended to exclude from their boundaries the land forming the district. But, apparently in order that the people of the ceded territories should not be deprived of government, it was specifically provided in the acts of cession and in the act of acceptance that the laws of the respective states should remain in force in the territory ceded by them until superseded by acts of congress.

The first act of congress for the government of the district, February 27, 1801 (2 Stat. 103), specifically provided "That the laws of the state of Virginia, as they now exist, shall be and continue in

force" in that part of the district ceded by Virginia, and "that the laws of the state of Maryland, as they now exist, shall be and continue in force" in that part of the district ceded by Maryland. The district was divided into two counties, the county of Washington on the east of the Potomac and the county of Alexandria on the west. A circuit court was established, to consist of one chief judge and two assistant judges. It was given cognizance of civil and criminal matters; it was to sit for the county of Washington in the city of Washington; for the county of Alexandria at Alexandria. A district attorney and marshal were provided, and a register of wills and an orphans' court were established. This was supplemented by an act of March 3, 1801 (2 Stat. 115), which clarified the duties of officers and provided for a "levy court" to act as county commissioners in each of the counties. This was further supplemented by an act of May 3, 1802 (2 Stat. 193). On the same date an act was passed incorporating the city of Washington (2 Stat. 195). This provided for a mayor to be appointed by the President of the United States, and a city council to be elected annually by ballot "by the free white male inhabitants of full age, who have resided twelve months in the city, and paid taxes therein the year preceding." The city of Georgetown, within the territory ceded by Maryland prior to the cession, had been incorporated under the laws of Maryland, and provided for the election of the councilmen of the city. These statutes continued, with slight modification, except that the part originally ceded by Virginia was re-ceded to it in 1846, until 1871 (24 Columbia Hist. Soc. Rec., pp. 89-117). Up to that time the county and city governments in the district functioned very much as county and city governments in a state, and without any interference by any department of the federal government, or even by the President. (*Metropolitan R'd v. Dist. of Columbia,* 132 U. S. 1, 33 L. Ed. 231.) By the act of February 21, 1871 (16 Stat. 419), congress established a form of government for the district, with all the apparatus for a district government. The charters of the cities of Washington and Georgetown were repealed and the levy court of the District of Columbia was abolished. The entire district was made a body corporate for municipal purposes. A governor and secretary for the district were appointed by the President; legislative powers were vested in a legislative assembly consisting of a council of eleven members appointed by the President, and a house of delegates consisting of twenty-two members to be elected by the people. Authority was given to divide

the district outside of the cities into townships and for the election of township officers, and provision was made for election of a delegate' to the house of representatives, who should have the same rights and privileges as are exercised by delegates in the several territories, and should also be a member of the committee for the District of Columbia. This organization functioned for about three years, when its affairs were inquired into by a select committee of congress. (Senate Reports, Affairs in the District of Columbia, 1st Session 43d Congress.) This committee reported that it had "unanimously arrived at the conclusion that the existing form of government of the district is a failure; . . . and that no remedy short of its abolition and the substitution of a simpler, more restricted, and economical government will suffice." By the act of June 20, 1874 (18 Stat. 116), the government established by the act of 1871 was abolished, and by that and subsequent acts the government of the District of Columbia has been performed directly by congress, or by a congressional committee.

We review this history of the creation and government in the District of Columbia primarily to make it clear that in the organization of the district care was used that the people would not be left without an effective government; that congress may exercise less than its full authority, or its full authority, in enacting laws for the government of such a district; that to the extent that it did not exercise its full authority it permitted the laws of the state, even election laws, to continue in force; and finally to point out that there is no contention in this case that the federal government, with respect to the soldiers' home, has undertaken to exercise its full authority to enact laws for the government of the people situated there.

We cannot conceive it to have been possible that the framers of our federal constitution, by inserting clause 17 in section 8 of article 1, intended thereby to make it possible for the inhabitants of small areas within states, purchased or otherwise acquired by the federal government with their consent, to be left without an adequate system of laws. Certainly no such situation ever was contemplated if the acts relating to the creation and government of the District of Columbia are a guide.

After our court held that our state laws prevailed over the Fort Leavenworth military reservation (*Clay v. State,* 4 Kan. 49) our legislature enacted a statute (Laws 1875, ch. 66), the pertinent section of which reads:

"That exclusive jurisdiction be and the same is hereby ceded to the United States over and within all the territory owned by the United States, and included within the limits of the United States military reservation known as the Fort Leavenworth reservation, in said state, as declared from time to time by the President of the United States, saving, however, to the said state the right to serve civil or criminal process within said reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said state, but outside of said cession and reservation; and saving further, to said state, the right to tax railroad, bridge and other corporations, their franchises and property, on said reservation." (§ 1.)

A railroad company, having property on the reservation, paid taxes thereon to prevent the levy on its property, and sued to recover. The court held (*Ft. L. Rld. Co. v. Lowe, Sheriff*, 27 Kan. 749):

"The state of Kansas has power and authority to tax railroad property belonging to a private corporation, situated exclusively within the boundaries of the Fort Leavenworth military reservation." (Syl.)

The opinion indicates the court had several reasons for this result. On appeal to the supreme court of the United States (114 U. S. 525, 29 L. Ed. 264) our judgment was affirmed. In the course of the opinion, discussing the last part of article 1, section 8, clause 17, of the federal constitution, it was said:

"It would seem to have been the opinion of the framers of the constitution that, without the consent of the states, the new government would not be able to acquire lands within them; and therefore it was provided that when it might require such lands for the erection of forts and other buildings for the defense of the country, or the discharge of other duties devolving upon it, and the consent of the states ·in which they were situated was obtained for their acquisition, such consent should carry with it political dominion and legislative authority over them. Purchase with such consent was the only mode then thought of for the acquisition by the general government of title to lands in the states. Since the adoption of the constitution this view has not generally prevailed. Such consent has not always been obtained, nor supposed necessary, for the purchase by the general government of lands within the states. If any doubt has ever existed as to its power thus to acquire lands within the states, it has not had sufficient strength to create any effective dissent from the general opinion." (p. 530.)

It was pointed out that the federal government might acquire lands by purchase, or by gift, or by eminent domain. (*Kohl v. United States*, 91 U. S. 367, 23 L. Ed. 449.) After a lengthy general discussion the court concluded:

"The military reservation of Fort Leavenworth was not, as already said, acquired by purchase with the consent of Kansas. And her cession of jurisdiction is not of exclusive legislative authority over the land, except so far as

that may be necessary for its use as a military post; and it is not contended that the saving clause in the act of cession interferes with such use. There is, therefore, no constitutional prohibition against the enforcement of that clause. The right of the state to subject the railroad property to taxation exists as before the cession." (p. 542.)

Commenting on this case in *Arlington Hotel v. Fant*, 278 U. S. 439, 73 L. Ed. 447, 49 Sup. Ct. 227, Chief Justice Taft, speaking for the court, and after quoting our statute (Laws 1875, ch. 66), said: "The last words seem to save fully the right of the state to tax the railway."

Another case, *C. R. I. & P. Rly. Co. v. McGlinn*, 28 Kan. 274, arose involving this statute (Laws 1875, ch. 66). In 1874 our legislature enacted a statute (Laws 1874, ch. 94), in short, making every railroad company liable to the owner of livestock killed by the engines or trains of the railroad on its unfenced right of way. McGlinn sued the railroad company to recover the value of an animal killed by the railroad on its unfenced right of way on the Fort Leavenworth reservation. The railroad company contended the act was not effective on the military reservation because jurisdiction over it had been ceded to the federal government (Laws 1875, ch. 66). The court held that the statute of 1874, relating to the killing or wounding of stock by the railroads, "continued to be operative within the limits of the reservation, as it [the act] had not been abrogated by congress, and was not inconsistent with the existing laws of the United States." The railroad company appealed to the supreme court of the United States, where the judgment of this court was affirmed. (*Chicago & Pacific Railway Co. v. McGlinn*, 114 U. S. 542, 5 S. Ct. 1005, 29 L. Ed. 270.) It was held that the act of our legislature (Laws 1875, ch. 66), ceding to the United States exclusive jurisdiction over the Fort Leavenworth military reservation, was a valid cession within the requirements of the constitution (Art. 1, § 8, cl. 17). In the opinion it was said:

". . . the contention of the railroad company is that the act of Kansas [Laws 1874, ch. 94] became inoperative within the reservation upon the cession to the United States of exclusive jurisdiction over it. We are clear that this contention cannot be maintained." (p. 546.)

There is then a discussion of the general rule respecting what laws remained in force when a territory is ceded by one sovereign nation to another, as the cession of Florida by Spain to the United States, and citing *American Insurance Co. v. Canter*, 1 Pet. 542, 7 L. Ed. 242. It was then said:

"The counsel for the railroad company does not controvert this general rule in cases of cession of political jurisdiction by one nation to another, but contends that it has no application to a mere cession of jurisdiction over a small piece of territory having no organized government or municipality within its limits; and argues upon the assumption that there was no organized government within the limits of Fort Leavenworth. In this assumption he is mistaken. *The government of the state of Kansas extended over the reservation, and its legislation was operative therein, except so far as the use of the land as an instrumentality of the general government may have excepted it from such legislation. In other respects, the law of the state prevailed.* . . . It is true there is a wide difference between a cession of political jurisdiction from one nation to another and a cession to the United States by a state of legislative power over a particular tract, for a special purpose of the general government; but the principle which controls as to laws in existence at the time is the same in both." (Italics inserted.) (p. 547.)

In *Vaughan et al. v. Northup et al.*, 15 Pet. 1, 10 L. Ed. 639, it was said:

"The United States, in their sovereign capacity, have no particular place of domicile; but possess, in contemplation of law, an ubiquity throughout the Union." (p. 6.)

See, also, *Federal Deposit Ins. Co. v. Mangiaracina*, 16 N. J. Misc. 203, 198 Atl. 777, and *Dodson v. Home Owners' Loan Corporation* (Tex. Civ. App.), 123 S. W. 2d 435.

Of necessity this must be true. The result is, the government of the state of Kansas and the government of the United States both extend over the Fort Leavenworth military reservation. The same is true of the area in question constituting the soldiers' home. It is noted in the McGlinn case, *supra*, that there is a "wide difference" between a cession of territory from one sovereign nation to another and a similar cession from a state to the federal government.

In determining how "wide" that difference is it must be remembered that our state government and our federal government must not be looked upon as sovereign nations, foreign to each other. The doctrine that each state is a sovereign nation, which prevailed at the close of the Revolutionary war, recognized in the Articles of Confederation and advocated by Stephens in his "The War Between the States," has passed with the passage of time and the necessities of our governmental institutions, just as has passed the thought entertained by the framers of our constitution that the only way the federal government could acquire land within a state for "forts, magazines, arsenals, dock yards, and other needful buildings," was by purchase.

In the Lowe case (27 Kan. 749, 759) it was pointed out that it was not necessary for the federal government to have exclusive jurisdiction over the Fort Leavenworth military reservation, for that condition did not exist from 1861 to 1875, and no serious inconvenience resulted. The ,same may be said here, for the federal government had a soldiers' home upon the area in question for many years before our statute was enacted ceding jurisdiction of the area to the federal government, and no inconvenience arose. It was only after these acts of cession were enacted that serious questions arose respecting the legal status and the rights and liabilities of the inhabitants of those areas, many of which questions never have been adjudicated. The federal constitution, acts of congress passed pursuant thereto, and treaties made by the federal government, are the supreme law of the land; they extend over all the area of our state, and there is no reason to apprehend that state laws could be enacted or enforced which would abrogate or interfere with any act of congress pertaining to the soldiers' home, or any other property in the state owned and used by the federal government. This, however, does not relieve us from the duty of deciding the question before us.

The Lowe and McGlinn cases have become leading cases, and particularly the doctrine of the McGlinn case that "the government of the state of Kansas extends over the" area in question. (See *Jewell v. Cleveland Wrecking Co.,* 28 F. Supp. 364.) In *Hoffman v. Power Co.,* 91 Kan. 450, 138 Pac. 632, it was held our wrongful-death statute is in effect on the Fort Leavenworth military reservation, and in *Craig v. Craig,* 143 Kan. 624, 56 P. 2d 464, a statute authorizing a resident of a military reservation to sue for divorce in a state court was upheld, upon the ground the state could legislate for those areas when congress had not done so.

In many cases the state and federal courts have been called upon to determine some question growing out of the purchase by the federal government of a small area within a state, or the cession by the state of such an area to the federal government. The following cases have been examined—there is no contention the list is complete: *Sadrakula v. James Stewart & Co., Inc.,* 5 N. Y. Supp. 2d 260; *Goldberger Const. Corporation v. Edmund J. Rappoli Co., Inc.,* 6 N. Y. Supp. 2d 472; *Seerman v. Lustig & Weil, Inc., et al.,* 299 N. Y. Supp. 920; *Valverde v. Valverde,* 121 Fla. 576, 164 So. 287 (1935); *Matter of Kernan,* 272 N. Y. 560, 4 N. E. 2d 737

(1936); *Pound v. Gaulding,* 237 Ala. 387, 187 So. 468 (1939); *Divine v. Bank,* 125 Tenn. 98, 140 S. W. 747 (1911); *Utley v. State Industrial Comm.,* 176 Okla. 255, 55 P. 2d 762 (1936); *Mason, Inc., v. State Tax Commission,* 188 Wash. 98, 61 P. 2d 1269 (1936); *Ryan v. State,* 188 Wash. 115, 61 P. 2d 1276 (1936); *Atkinson v. State Tax Comm.,* 156 Ore. 461, 67 P. 2d 161 (1937); *In re Annexation of Reno Quartermaster Depot, etc.,* 180 Okla. 274, 69 P. 2d 659 (1937); *State v. Ranier National Park Co.,* 192 Wash. 592, 72 P. 2d 464 (1937); *Williams v. Arlington Hotel Co.,* 15 F. 2d 412 (1926); *St. Louis-San Francisco Ry. Co. v. Satterfield,* 27 F. 2d 586 (1928); *Danielson v. Donmopray,* 57 F. 2d 565 (Wyoming, 1932); *Oklahoma City v. Sanders,* 94 F. 2d 323 (1938); *Vilas v. Manila,* 220 U. S. 345, 31 S. Ct. 416; *United States v. Unzeuta,* 281 U. S. 138, 50 S. Ct. 284; *Arlington Hotel v. Fant,* 278 U. S. 439, 49 S. Ct. 227; *Atkinson v. Tax Comm.,* 303 U. S. 20, 58 S. Ct. 419; *Murray v. Gerrick & Co.,* 291 U. S. 315, 54 S. Ct. 432; *James Stewart & Co. v. Sadrakula,* 60 S. Ct. 431 (decided January 29, 1940); *Commonwealth v. Clary,* 8 Mass. 72 (1811); *Employers' Liability Assurance Corp. v. Dileo* (Mass.), 10 N. E. 2d 251 (1937).

While these opinions necessarily vary, depending upon the specific question before the court, and some of them lean somewhat on the ancient doctrine of diverse sovereignty, generally they may be said to agree that the laws of the state in effect at the time of the consent or cession by the state remain in effect, unless and until they are superseded by acts of congress. The growing tendency is to construe article 1, section 8, clause 17, of the federal constitution, and the acts of state legislatures consenting to the purchase or ceding of small tracts within the state, in such a way that no area, however small, shall be left without a developed legal system. See, particularly, the latest decisions, *supra,* of the United States supreme court. There are a few cases, some early in our history and one late (*Jewell v. Cleveland Wrecking Co.,* 28 F. Supp. 364), holding that the state laws become federal laws for the area in question and are enforceable only in the federal court, but as we read the cases this doctrine is decidedly in the minority. It appears to be a hang-over of the old doctrine of diverse sovereignty. The great majority of these cases, including all of our own, hold that the state laws remain in force over the area in question, and that causes of action arising under them may be brought and determined in the state courts. This would not be true, of course, if the area in question were no longer within the boundaries of the state.

It is argued that the rule above mentioned applies only to what are termed municipal laws, property rights, and the like, and that it does not apply to political rights. This would be true if the state and federal governments were, with respect to each other, separate sovereign nations, as were Spain and the United States at the cession of Florida (*American Insurance Co. et al. v. Canter*, 26 U. S. [1 Pet.] 511, 7 L. Ed. 242), but that is not the relationship between our state and the federal government. A citizen of the United States is a citizen also of the state in which he resides. (See § 1, 14th Amend. to U. S. Const.)

"Every citizen owes allegiance to both of these governments, and, within their respective spheres, must be obedient to the laws of each. In return he is entitled to demand protection from each within its own jurisdiction." (11 C. J. 776.)

Political rights are defined as those which may be exercised in the formation or administration of the government—the power to participate, directly or indirectly, in the establishment or management of the government, those rights which belong to a nation, or to a citizen, or to an individual member of a nation. (49 C. J. 1076.) A citizen of the United States who resides in a state has political rights in the federal government as well as in the state government. As a citizen of the United States he has a right to vote for United States senators and representatives, and the "times, places and manner" of holding elections for those officers "shall be prescribed in each state by the legislature thereof." (U. S. Const., art. 1, § 4.)

We find no federal case holding that a resident of an area purchased by the federal government, with the consent of the state, is not entitled to vote. A few state courts have so held. (*Opinion of the Justices*, 42 Mass. [1 Met.] 580 [1841]; *Sinks v. Reese*, 19 Oh. St. 306 [1869]; *McMahon v. Polk*, 10 S. D. 296, 73 N. W. 77 [1897]; and *State, ex rel., v. Willett*, 117 Tenn, 334, 97 S. W. 299 [1906].) The Massachusetts case, so far as any reason is given for the opinion, appears to be based upon the view of diverse sovereignty between the state and the federal government. The other three cases followed upon that view. We think the basis is an erroneous one. They have, however, formed the authority for the text of encyclopedias and treatises on elections cited and relied upon by appellee. In *Stephens v. Nacy*, 49 Mont. 230, 141 Pac. 649 (1914), the doctrine was broken away from to this extent, that votes were

permitted to be counted from a precinct, a part of which was in an Indian reservation and where the treaty with the Indian tribe provided that it should not be included within the boundaries of any state without the consent of the Indians, and no such consent had been obtained. It seems further to have been broken away from in *Porter v. Hall*, 34 Ariz. 308, 271 Pac. 411 (1928), where the fact that the voter was an Indian, residing on an Indian reservation, was held not to deprive him of the right to vote. He was, however, deprived of the right to vote because of another clause of the state constitution which prohibited anyone under guardianship from voting, and he was held to be a ward of the United States. We think none of these cases is controlling.

Who may vote in this state is to be determined by our constitution and our laws. Article 5 of our constitution deals with suffrage. Section 1 reads:

"Every citizen of the United States of the age of twenty-one years and upwards—who shall have resided in Kansas six months next preceding any election, and in the township or ward in which he or she offers to vote, at least thirty days next preceding such election—shall be deemed a qualified elector."

By section 2 certain classes of persons are disqualified, but it is not contended the voters in this class whose ballots are questioned are disqualified under any of the provisions of this section.

By section 3 it is provided that no persons shall be deemed to have gained or lost a residence by reason of certain situations, one of which is "while kept at any almshouse or other asylum at public expense."

In *Cory v. Spencer*, 67 Kan. 648, 73 Pac. 920, it was held that a member of this same Soldiers' Home, "while maintained therein at public expense, is not deprived of the right to acquire a residence there for voting purposes." Under the federal statute (24 U. S. C. A. § 131; 38 U. S. C. A. § 11) it seems clear the inmates of the soldiers' home may become permanent residents there, and perhaps most of them do so.

In this case the trial court specifically found that the persons who voted in the precincts in question "were on the date of the election residents of said precincts and claimed their right to vote at such election by reason of their residence in said precincts." This finding is not complained of. No contention is made that the voters had not resided in the state, or in the precincts, a sufficient length of time to be eligible to vote under our constitution.

As early as 1909 our legislature specifically provided (Laws 1909, ch. 133) for holding elections in the soldiers' home, and by virtue of this authority precincts were established in the home for the holding of the election. The election in question was conducted in harmony with the general election laws of the state. There is no contention to the contrary. The only ground upon which the court below rested its decision was that the land constituting the soldiers' home was not a part of the state of Kansas on the date of the election. We are convinced that conclusion of law is wrong.

The judgment of the court below should be reversed with directions to enter judgment for the appellant in this court.

Mr. Justice SMITH and Mr. Justice WEDELL concur in this dissent.